437 So.2d 840 (1983)
Lloyd GUILLOT and Karen Sellers Guillot
v.
FISHERMAN'S PARADISE, INC., Flying Bridge Marina, Inc., Gilbert L. Dozier and Gerald Strickland.
No. 83-C-0057.
Supreme Court of Louisiana.
September 2, 1983.
Rehearing Denied October 7, 1983.[*]
*841 Daniel J. McGee, Rozas, Manuel & McGee, Mamou, for applicants.
Felix R. Weill, Watson, Blanche, Wilson & Posner, Thomas H. Watts, Charles M. Raymond, Mary Thompson, Baton Rouge, for respondents.
DIXON, Chief Justice.
Mr. and Mrs. Lloyd Guillot sued Fisherman's Paradise, Inc., Flying Bridge Marina, Inc., Gilbert L. Dozier and Gerald Strickland[1] for the wrongful death of their minor son, Kelin Ray Guillot. Kelin Guillot drowned in a sewerage oxidation pond which was located on property known as the Flying Bridge Marina on Easter Sunday, March 26, 1978. After trial, the court dismissed the Guillots' claim against the defendant corporations, Flying Bridge Marina, Inc. and Fisherman's Paradise, Inc. The court of appeal affirmed. Guillot v. Fisherman's Paradise, Inc., et al., 422 So.2d 1194 (La.App.1982).
The trial court concluded that Fisherman's Paradise, Inc. and Flying Bridge Marina, Inc. were negligent in failing to enclose the oxidation pond, since it was foreseeable that this kind of accident might occur. The trial judge stated: "Knowing children and their nature, I think it was entirely foreseeable that children would be attracted ... children love to climb hills and mounds and things of that kind, and that there should have been a fence preventing young children from going into that pond." However, the trial court denied *842 the Guillots recovery, finding that they were contributorially negligent "for allowing a two and one-half year old child to be ridden on a minibike, out of their sight, by an eight and a half or nine year old brother, in an area that was unfamiliar to both parents." He found that "they failed to provide adequate supervision for the child under the circumstances as they existed at that time."
Considering the claim under a C.C. 2317 basis, the trial judge stated: "Defendant's failure to properly fence the pond and to provide sloping sides convinces the Court that the premises had a defect, which defect was a cause of the death of plaintiffs' child." He further found that the contributory negligence of the parents constituted "fault of a third party." He determined that their "conduct being a cause of the accident" precluded them from recovery for the wrongful death of their child.
The court of appeal affirmed the trial court's findings and judgment. The court of appeal concluded that the Guillots' recovery was barred under the theory of negligence and under the theory of strict liability because of "their failure to adequately supervise the deceased child."
We granted writs upon application of the Guillots to review the trial court and the court of appeal judgments as to the defendant corporations, Fisherman's Paradise, Inc. and Flying Bridge Marina, Inc.
Mr. and Mrs. Guillot and their two children, Kelin Ray, age two and one-half, and Kevin, age eight, had gone to spend the Easter Holiday weekend with Mrs. Guillot's parents, Mr. and Mrs. Sellers, at the Sellers' camp on the Toledo Bend Reservoir. Only Kevin had been to the camp previously with his grandfather, Mr. Sellers. On Easter Sunday morning, after breakfast, there was an Easter egg hunt for the children. Following the hunt, Mr. Guillot took the two boys for a paddle boat ride in an inlet of Toledo Bend Lake which bordered the back of the Sellers' property. The family ate Easter dinner at approximately 1:00 p.m., after which, at about 2:00 or 2:30 p.m., Mr. Guillot, Kevin and Kelin began riding a minibike Mr. Guillot had brought to the camp for Kevin. Mr. Guillot and Kevin took turns giving Kelin a ride on the minibike. Kevin testified that Kelin always rode in front of the driver when being driven on the minibike. The other adults, Mrs. Guillot and Mr. and Mrs. Sellers, were cleaning the Sellers' yard around a playhouse which was near the driveway gate.[2]
Mr. Guillot ceased riding the minibike and Kevin continued, alternating riding alone and riding his brother. Mr. Guillot joined the other adults cleaning the property. Mrs. Sellers and Kevin testified that when Kevin would let Kelin off of the minibike to ride alone he would put Kelin in the yard and Kelin would go toward the adults until Kevin returned. The driveway gate was left partially open because of the minibike riding.
The ride consisted of a five to eight minute round trip ride on a dirt road which ran from the Sellers' camp to a blacktop highway. The distance of the ride was approximately three hundred yards. The dirt road dead ended at the camp next to the Sellers' camp. There was a slight turn in the dirt road which caused the children to be out of sight for a brief period of time during the round trip.
There was testimony by Dennis Smith, a former employee of Flying Bridge Marina, that the two boys rode on another road, partially topped and partially dirt, which ran parallel to the dirt road and led to the Marina. He further testified that he saw them riding on the Marina property past the dock and gas pumps toward the area where the oxidation pond was located. However, Kevin Guillot testified that they only traveled on the dirt road between the Sellers' camp and the blacktop highway.
Kevin testified that, prior to his last ride alone, he took Kelin for a ride on the minibike *843 and upon returning to the Sellers' camp let Kelin off inside the open gate and watched him walk toward his grandmother in the direction of the playhouse. Mrs. Guillot testified that she saw Kelin playing in the sand by the gate eight to ten minutes before it was discovered he was missing.
When Kevin returned from his solo ride, Mrs. Sellers asked him where Kelin was. Kevin and Mrs. Sellers testified that he told her he had let Kelin off inside the gate. A search then began for Kelin, at approximately 3:00 or 3:30 p.m. Forty to sixty minutes later the child's body was discovered floating face down in the sewerage oxidation pond. Mr. Guillot recovered the child's body from the pool and attempted to revive him. Upon arrival of the parish officers, Mr. Guillot and one of the officers continued to administer CPR while the child was transported to the hospital in Many, Louisiana. These efforts to save the child's life were of no avail. The child's death certificate listed the cause of death as "drowning;" no autopsy was performed.
The Sellers' camp was completely fenced in on three sides; the fourth side was bordered by the inlet from the lake; the two side fences ran from the front fence along the dirt road into the water. The driveway gate was the only non-water exit and entrance to the Sellers' camp.
The oxidation pond is approximately one hundred to one hundred twenty yards from the gate of the Sellers' fenced in property. Between the Sellers' camp and the oxidation pond lie two roads: the dead end dirt road which leads from the Sellers' camp to the blacktopped highway and the marina road which paralleled it, then followed the lake bank back to the highway. There was a narrow shallow grassy gully between these two roads. A portion of the three to three and a half foot wire fence which surrounded the marina was down. The marina property facing the Sellers' lot was not fenced. Debris had been dumped in this area, consisting of some pipes, fifty gallon drums and three or four fallen trees. Some house trailer units rented to fishermen and families were along the road, between the road and the pond, which was fifty to sixty feet from the row of trailers. (The pond actually consisted of two ponds, a smaller one and a larger one, which were separated by a small mound of dirt). The oxidation pond was not visible from the Sellers' camp; the embankment of the pond, however, was visible from the camp.
The sewerage oxidation pond was completely covered with light green algae approximately one inch thick, trapping trash such as cans and cups. A two and a half to three foot embankment surrounded the pond, but there was no other border surrounding the sewerage oxidation pond. There was a partially completed fence around the pond, but it was only for aesthetic purposes. Mr. Dozier explained: "It was a wooden, crossed fence. Had it been intended to keep children out of the pond or had there been any requirement for that, they'd either have used hog wire or chicken wire, something smaller." The pond was the same depth from the banks to the middle. Mr. Guillot testified that it was waist deep. The sides of the pond did not slope, but formed a straight drop from the embankment sides into the water.
The record establishes that neither the Guillots nor the Sellers knew of the existence of the sewerage oxidation pond. In fact, the entire marina area, except for the store and the gas pumps in front of the store, was unfamiliar to the Guillots and the Sellers. Kevin testified that he and his grandfather once went to the store to purchase cereal for breakfast at the camp on an occasion prior to the accident. Mr. Sellers had bought gas for the lawnmower the Saturday before Easter from the gas pumps in front of the store.
Mr. Sellers, Mr. Guillot, Mrs. Guillot and Kevin all testified that Kelin had never wandered before and that he was an obedient child. Mr. Guillot, Mr. Sellers and Mrs. Guillot testified that they had warned Kelin about the lake, the only hazard they were aware of, and that he never went to the lake to feed the ducks unless accompanied by an adult.
*844 Actionable negligence results from the creation or maintenance of an unreasonable risk of injury to others. Bass v. Aetna Insurance Co., 370 So.2d 511, 514 (La.1979); Guilbeau v. Liberty Mutual Insurance Co., 338 So.2d 600, 602 (La.1976); Smolinski v. Taulli, 276 So.2d 286, 288 (La. 1973). See also Shelton v. Aetna Casualty & Surety Co., 334 So.2d 406 (La.1976); Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972). In determining whether the risk is unreasonable, not only the seriousness, but also the likelihood of the harm that may be caused is relevant. Bass v. Aetna Insurance Co., supra; Guilbeau v. Liberty Mutual Insurance Co., supra.
"... Further, where small children may be expected to be exposed to the risk, liability for their consequent injury results from conduct or from the maintenance of premise conditions creating an unreasonable risk of injury to them...." Smolinski v. Taulli, supra at 288.
Young children are naturally attracted to exposed pools and bodies of water. Exposed bodies of water with no enclosure or barricade present a great risk of drowning to children of tender years. Saxton v. Plum Orchards, Inc., 215 La. 378, 392-93, 40 So.2d 791, 796 (1949); Smith v. City of Baton Rouge, 166 La. 472, 476-77, 117 So. 559, 561 (1928). See also Palermo v. Orleans Ice Manufacturing Co., 130 La. 833, 835-36, 58 So. 589, 590 (1912); Clifford v. Recreation & Park Commission of the Parish of East Baton Rouge, 289 So.2d 373, 376 (La.App. 1973), writ denied 293 So.2d 168 (La.1974).
The sewerage oxidation pond was undoubtedly attractive and alluring to children in view of its contents and location. It was covered with a light green grassy algae which contained debris. It was not fenced in or enclosed and was located on a recreation facility near trailers often rented to families on vacation.
The risk of drowning presented by the sewerage oxidation pond could have been easily eliminated by the installation of a fence or other enclosure sufficient to keep children out. Under the circumstances of this case, the installation of a fence or other enclosure was a precaution which a reasonable person would have taken.
Accordingly, as found by the lower courts, the defendants are guilty of negligence and are liable to the decedent's parents for the wrongful drowning of their minor child under articles 2315 and 2316 of the Louisiana Civil Code.
Nor were the parents barred from recovery by contributory negligence.
The action of the parents in permitting the deceased child to ride on a minibike with his older brother had no causal connection with the child's drowning in the pond. As noted by Judge Ponder in his dissent: "The child had been dropped off inside the gate within a short distance and within the eyesight of the four adults." Guillot v. Fisherman's Paradise, Inc., supra at 1196. Kelin had ceased riding the minibike without adverse results. There was no causal connection between the riding of the minibike and the drowning and, thus, the parents cannot be held contributorily negligent for allowing Kelin to ride the minibike.
Nor was the parental supervision of the child substandard. This court in Smolinski v. Taulli, supra at 290 stated:
"Failure to take every precaution against every foreseeable risk or to use extraordinary skill, caution, and foresight does not constitute negligence or contributory negligence.... A mother of small children is not required to chain them up or to act as their constant jailer in order to absolutely secure them from exposure to hazards negligently created or maintained by a tortfeasor. She is required only to use reasonable precautions, and her conduct in this regard is not negligent if, by a common-sense test, it is in accord with that of reasonably prudent persons faced with similar conditions and circumstances...."
See also Smith v. Trahan, 398 So.2d 572 (La.App.1980).
Measured by this standard the parents' precautions against harm to their child were reasonable and did not fall below the *845 standard of conduct required for such protection. The Guillots and the Sellers had warned Kelin about the lake and had never permitted him to go alone to the lake to feed the ducks; an adult always accompanied him. This was the only water hazard the Guillots and the Sellers were aware of. The inattention of the parents which allowed a child, who had never wandered before, to escape from his parents' eyesight and attention does not amount to contributory negligence. The child was dropped off by his brother, Kevin, inside the gate and was seen by Kevin, going toward his grandmother. Mrs. Guillot saw the child playing in the sand near the gate just minutes before it was discovered that the child was missing. The gate was left partially open for the coming and going of the minibike. The action of leaving the gate partially open in an area where there was much activity and presence of five other persons does not constitute contributory negligence.
Contributory negligence is an affirmative defense. C.C.P. 1005; Bass v. Aetna Insurance Co., supra; McInnis v. Fireman's Fund Insurance Co., 322 So.2d 155 (La.1975); Smolinski v. Taulli, supra. The defendants have not borne their burden of proving contributory negligence on the part of the parents.
For the reasons assigned, the judgments of the district court and the court of appeal are reversed insofar as they dismiss the demand of the plaintiffs. The case is remanded to the court of appeal to fix the damages to which the plaintiffs, Mr. and Mrs. Guillot, are entitled. All costs are taxed against the corporate defendants, Flying Bridge Marina, Inc. and Fisherman's Paradise, Inc.
NOTES
[*] Blanche, J. would grant a rehearing.
[1] The trial court granted a judgment of dismissal as to Gilbert L. Dozier pursuant to C.C.P. 1810, and service was never obtained on Gerald Strickland. On the October 7, 1975 Fisherman's Paradise, Inc. bought all of the outstanding stock and assets of Flying Bridge Marina, Inc. and assumed responsibility for all debts.
[2] Mr. Sellers testified that Mrs. Sellers was "right at the gate, if you want to call that outside the fence, where the pump house is, right up against the fence, fooling with a vine, when Kevin came back ..."