527 So.2d 329 (1988)
Earl MAYER on Behalf of Rachel MAYER and Diane Mayer
v.
TULANE MEDICAL CENTER.
No. CA-9108.
Court of Appeal of Louisiana, Fourth Circuit.
May 12, 1988.
Rehearings Denied July 19, 1988.
*330 Bett C. Gibson, Rodney P. Vincent, Gertler, Gertler and Vincent, New Orleans, for appellee.
R. Henry Sarpy, Jr., Robert L. Walsh, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for appellant.
Before SCHOTT, BYRNES and LOBRANO, JJ.
LOBRANO, Judge.
This appeal arises from a judgment in favor of plaintiff, Earl Mayer, on behalf of his minor daughter Rachel Mayer, and against defendant, Tulane Medical Center, for personal injuries sustained by Rachel as a result of Tulane's negligence.
FACTS:
On September 20, 1984, Diane Mayer took her son, Nicholas, to the sixth floor of the Tulane Medical Center for his regular appointment with Dr. Godfrey. Mrs. Mayer brought her two year old daughter, Rachel, along with her. While Nicholas was being seen by Dr. Godfrey, Mrs. Mayer sat reading a magazine in the waiting room. Rachel played in the adjacent playroom. The playroom was provided and staffed by Tulane and contained various toys for the children to play with. One of these toys was a Tinker Toy. Rachel had accompanied her mother on numerous other occasions and had played in the playroom both alone and with her mother.
Following Nicholas' session, Mrs. Mayer and Dr. Godfrey were conversing in the waiting room/reception area. Rachel exited the playroom holding a green stick (alleged to be a Tinker Toy). As the child crossed the waiting room she fell face down. The stick punctured her eyelid. A CAT scan and x-ray revealed the possibility of a tiny bone fragment impinging on the cortex of her inferior left frontal lobe. A craniotomy was performed. A small laceration was discovered in the dura (the protective sac covering the brain) in the left frontal lobe. Near the laceration, a tiny bone fragment was removed from the cortex of the frontal lobe.
As a result of these injuries, Earl Mayer, on behalf of Rachel, and Diane Mayer, on *331 her own behalf, sued CBS Toys, manufacturer of the Tinker Toy and Tulane Medical Center for damages. Plaintiffs alleged that Tulane was negligent for failing to properly supervise Rachel and for maintaining a defective carpet which caused Rachel to fall. Tulane, in turn, filed a third party demand against Diane Mayer, alleging that the injury to Rachel resulted from her failure to properly supervise her two year old child.
Trial by jury was held on June 8 and June 10, 1987. The jury returned a verdict holding that the actions of Tulane's employees were the proximate cause of Rachel's injuries. They also found that Diane Mayer was 60% at fault in failing to supervise Rachel. CBS Toys was absolved from all responsibility. The jury initially awarded $125,000.00 in total damages. After further questioning of the jury, the trial court gave additional instructions concerning the damage award, and ordered further deliberations. The jury returned a second verdict in the amount of $312,500.00.
On June 12, 1987, judgment was entered against Tulane in the amount of $312,500.00. Pursuant to Tulane's third party demand, judgment was entered in favor of Tulane and against Diane Mayer for 60% contribution. Tulane filed Motions to Reinstate the original jury verdict of $125,000.00, for a Remittitur, for a Judgment Notwithstanding the Verdict (NOV) and for a new trial. All were denied.
Tulane appeals the judgment on the main demand. Diane Mayer answers the appeal assigning as error the jury's assessment of 60% fault on her part.
Tulane asserts the following assignments of error:
1. The jury was clearly wrong when it rendered a verdict finding Tulane to be 40% at fault because Tulane did not have a duty to supervise Rachel when the accident occurred.
2. The trial court erred in failing to reinstate the jury's initial award of $125,000.00 in damages.
3. The trial court committed reversible error when the court instructed the jury that any award rendered by them would be reduced by the percentage of Diane Mayer's negligence.
4. The trial court committed reversible error when it refused to exercise its discretion and instead deferred to the plaintiffs Tulane's request that Rachel attend trial so that the jury could view the true extent of Rachel's scar.
5. The trial court abused its discretion when it refused to grant Tulane a remittitur because the award of $312,500.00 was clearly excessive.
Diane Mayer by way of answer to the appeal, argues that the jury was clearly wrong in finding her 60% at fault.
ISSUES:
Considering the assignments of error by both Tulane and Diane Mayer, we determine the following issues to be dispositive of this appeal.
1. Was there manifest error in apportioning fault between Tulane and Diane Mayer at 40% and 60%, respectively?
2. Did the trial court err in re-charging the jury after the $125,000.00 verdict was rendered?
3. Did the trial court err in refusing to require the minor's presence at trial?
4. The correct damage award.
THE FAULT OF TULANE AND DIANE MAYER
Diane Mayer argues that the jury was clearly wrong in finding her to be 60% at fault. Tulane argues that the jury was clearly erroneous in finding 40% negligence on their part.
The evidence shows that Tulane provided a playroom facility for young children visiting the clinic. This facility is used by children of all ages, and is equipped and staffed by Tulane. Mrs. Mayer testified that Rachel accompanied her to the Medical Center at least 95% of the time that she brought Nicholas for his regular appointment. She was thoroughly familiar with the playroom and was aware of the presence of the tinker toy in the playroom. She testified that if she had seen Rachel with the toy stick she would have taken it from her. She testified that the playroom is *332 geared toward children. Gertie Jones, the playroom supervisor, was in the room and that she felt safe letting Rachel roam freely.
Ms. Gertie Jones testified that the tinker toy was loosely stored in a wooden box without a lid and placed on the floor so that any child had access to it. She further testified that she made no attempt to place the sticks in an area inaccessible to very young children. When asked if she had considered whether young children should have access to such a toy, she answered that "[i]t never entered my mind." "I never considered it."
None of Tulane's witnesses admitted responsibility for the selection of toys for the playroom nor did they know who had such a responsibility. Only Dr. Godfrey testified that she appreciated the danger of exposing such a toy to very young children. However, she admitted taking no action to remove the toy or eliminate the risk.
The accident occurred while Mrs. Mayer was speaking with Dr. Godfrey. Rachel came from the playroom to the waiting room in the general direction of her mother. Both Mrs. Mayer and Dr. Godfrey testified they did not look directly at Rachel as she exited the playroom, but noticed her peripherally. Dr. Godfrey noticed she was carrying the stick, but Mrs. Mayer did not. Both were preoccupied with making an appointment for Nicholas' next visit. Both heard the "thud" of Rachel's fall, but neither actually witnessed it. Mrs. Mayer did not realize the stick punctured Rachel's eyelid until the child got up. She quickly picked up Rachel and held her while Dr. Godfrey called for help. While in her mother's arms, Rachel pulled the stick from her head.
Parents are under a duty to properly supervise and protect their young children. Carter v. Salter, 351 So.2d 312 (La. App. 3rd Cir.1977), writ denied, 352 So.2d 1045 (1977). This duty is measured by a standard of what a reasonable parent would do under the same or similar circumstances. Ryals v. Home Insurance Company, 410 So.2d 827 (La.App. 3rd Cir.1982), writ denied, 414 So.2d 375 (1982). Failure to take every precaution against every foreseeable risk or to use extraordinary skill, caution, and foresight does not constitute negligence. Smolinski v. Taulli, 276 So.2d 286 (La.1973). A mother of a small child is required only to use reasonable precautions, and her conduct in this regard is not negligent if, by a common sense test, it is in accord with that of a reasonably prudent parent faced with similar conditions and circumstances. Guillot v. Fisherman's Paradise, Inc., 437 So.2d 840 (La. 1983); Smolinski v. Taulli, supra;
A person (non parent) who has actually undertaken the control and supervision of a child has a duty to use reasonable care to protect the child from injury. While such a person is not an insurer of the child's safety, he is required to use reasonable care commensurate with the foreseeable risk of harm to which the child might be subjected while under his control and supervision. Bonnet, Etc. v. Slaughter, 422 So.2d 499 (La.App. 4th Cir.1982); Williams v. Allstate Insurance Co., 268 So.2d 290 (La.App. 2nd Cir.1972). When a defendant creates an unreasonable risk of harm, actionable negligence results. If it is foreseeable that a small child may be exposed to this risk then liability results when there is a consequent injury. Bonnet v. Slaughter, supra; Smolinski v. Taulli, supra.
Applying these principles to the facts of this case we determine the jury committed manifest error in finding Tulane only 40% negligent. We determine that by providing playroom facilities for young children, including a playroom supervisor, Tulane undertook the duty to prevent an unreasonable risk of harm to these children. Tulane's duty went beyond that of mere supervision; it is a broader duty encompassing the more general duty of preventing harm to others. See, Duxworth v. Pat Caffey Contractor, Inc., 209 So.2d 497 (La.App. 4th Cir.1968). And once Tulane placed the "tinker toy" stick in the playroom occupied by small children, they created a foreseeable risk of harm which required a greater duty to protect Rachel, a two year old child. Thus, their negligence *333 is not only in preventing the risk of harm, but in creating it. Further, when considering the unreasonableness of a risk of harm, how easily that risk could have been eliminated should also be considered. Guillot v. Fisherman's Paradise, Inc., supra. Certainly, the removal of the tinker toy from a place easily accessible to small children is by no means difficult or costly.
We next turn to the question of Mrs. Mayer's negligence and the allocation of sixty percent of the total fault of her. In any duty-risk analysis the inquiry focuses on the reasonableness of the conduct of the defendant judged by a common sense standard. Guillot v. Fisherman's Paradise, Inc., supra. Based upon her previous visits to Tulane Mrs. Mayer was aware of the toys made available to the children including the tinker toy sticks. But the cause of Rachel's injury was not merely her availability to the sticks but the child's running with a stick when she tripped. The fault was with Tulane or Mrs. Mayer for failing to provide adequate supervision. When the child was running and fell Mrs. Mayer was in conversation with Dr. Godfrey. One of the primary purposes of the playroom was to provide supervised recreation for the children while the parent was consulting with the physician. Thus the burden of supervision at the time of the accident was on Tulane. The only possible breach of duty we can find on Mrs. Mayer's part was her failure to mention to Ms. Jones, the playroom supervisor, that she was going to speak to Dr. Godfrey, but this would not support the jury's allocation to Mrs. Mayer of sixty percent of the fault. We find this allocation manifestly erroneous and reduce it to twenty percent.
Plaintiff relies upon Outlaw v. Bituminous Ins. Co., 357 So.2d 1350 (La. App. 4th Cir.1978), writ denied 359 So.2d 1293, for the proposition that a finding of fault on Tulane's part precludes fault on the part of Mrs. Mayer. In Outlaw the court held that negligent injury to a child by a third party is not within the risk which the parent's duty of supervision is designed to protect against. However we distinguish the present case from Outlaw on its facts. The specific duty breached in Outlaw was the parents' duty not to allow an unsupervised nine-year-old to subject himself to the inherent dangers of a golf course. But the child was injured not as a result of a normal golf course risk but from an act of negligence by a golfer. In the instant case Mrs. Mayer was present with the child when she was hurt, and she breached her duty when she failed to tell Ms. Jones she was going to speak to Dr. Godfrey so that Ms. Jones would be fully aware of her responsibility to supervise the child.
Based on these reasons we conclude that Tulane was 80% negligent, and Diane Mayer 20% negligent.
THE JURY'S AWARD OF DAMAGES
Initially the jury answered interrogatory No. 12 in the amount of $125,000.00. That interrogatory provided:
"What amount of money do you award on behalf of Rachel Mayer to fully compensate her for all damages?" (emphasis ours)
After the jury was polled with respect to each interrogatory, the court then asked each juror the following question:
"So this $125,000.00 that you awarded to plaintiff to compensate for the damages has been reduced to the 40%; is that your intention?"
Each juror responded "yes" to that question. The court then responded:
"The Court's convinced then from the responses of all jurors that the amount of $125,000.00 has already been adjusted for the negligence attributed to the two parties involved and that this is the amount that you see Tulane Medical Center responsible for; is that correct?"
All jurors responded "yes". The court then instructed the jury: "Rather than you reducing the amount to $125,000.00 to take into consideration the negligence of the various parties, what we need you to do is to return a total figure and then the court will reduce that amount according to the negligence of the parties."
In response to that direction, the jury foreman stated: "We started with $150,000.00 *334 and then the majority agreed on $125,000.00."
The Court then questioned: "You did not reduce that amount by 40%?" The response was "No". Several jurors then answered that this was the total amount of damages the plaintiff is entitled to.
The Court then retired the jury to deliberate further, with the added statement: "I want a total amount of damages. I do not want it reduced, I do not want the total amount reduced because of the apportionment of any negligence. We will take care of the final apportionment."
The jury then returned a verdict of $312,500.00 which was made the judgment of the Court.[1] Tulane was awarded judgment on its third party demand against Diane Mayer for 60% of that amount.
Tulane argues that the jury intended Rachel's total compensation to be $125,000.00, and that the trial court erred in instructing the jury that their award would be reduced by Diane Mayer's fault.[2] Plaintiff argues the "second" verdict of $312,500.00 reflects the true intent of the jury, and the Court was correct in its instructions.
Considering the colloquy between the judge and jury as outlined above, we conclude that there was confusion in the juror's minds as to the correct answer to interrogatory No. 12. Compounding the confusion was the trial judge's remarks concerning "reduction" of the award by the fault of the parties. This was an incorrect statement. The plaintiff, Rachel, was not at fault, therefore there is no reduction of her award. The negligence of her mother cannot be imputed to her. Davis v. Royal Globe Ins. Co., 223 So.2d 912 (La.App. 4th Cir.1969), reversed on other grounds, 242 So.2d 839, cert. denied, 403 U.S. 911, 91 S.Ct. 2208, 29 L.Ed.2d 688; Vidrine v. General Fire & Casualty Company, 168 So.2d 449 (La.App. 3rd Cir.1964). Since Tulane was found to be a proximate cause of the accident, Rachel's judgment is against that party for the total damages. Tulane, of course, is awarded recovery on its third party demand against Diane Mayer based on her proportionate fault.
In Picou v. Ferrara, 483 So.2d 915 (La. 1986), on remand, 488 So.2d 1250 (La.App. 4th Cir.1986), our Supreme Court stated:
"When a jury is erroneously instructed and the error probably contributed to the verdict, the verdict must be set aside on appeal. Smith v. Travelers Insurance Co., 430 So.2d 55 (La.1983). Then the reviewing court, under its constitutional authority to review facts, should make an independent determination of the facts from the record, if possible, without according any weight whatsoever to the factual findings of the erroneously instructed jury." Id. at 918.

Based on these guidelines, and our conclusion that the jury was improperly advised and confused with respect to the damage issue, we make the following independent determination of quantum.
TESTIMONY OF NEUROSURGEON JOSEPH N. NADELL
Dr. Nadell testified that he first saw Rachel shortly after the accident. He observed a small laceration above her upper left eyelid. He immediately performed a neurological exam which revealed normal reflexes and no focal nerve or neurological damage. Dr. Nadell ordered follow up tests consisting of a cat scan of the brain and eye orbit and tomogramsspecialized x-rays of the skull. These tests revealed a possible break in the roof of the left orbit. From the test results, Dr. Nadell was unable to determine if the break was in the brain or pushing on the brain. It was determined that exploratory surgery was needed and a craniotomy was ordered. Dr.
*335 Nadell did not feel the craniotomy was an emergency procedure.
Dr. Nadell described the surgery as follows:
An incision was made across the top of Rachel's forehead from ear to ear slightly behind the hairline. The scalp of the forehead was then peeled down to expose the skull. Several holes were then drilled into Rachel's skull disconnecting a triangular section of bone called a "bi-frontal flop". This section of bone was several inches long and was taken from above the left eyebrow. Once Dr. Nadell removed the bone, a visual inspection was made of the covering of the brain (the dura). The inspection revealed a small tear. An incision was then made into the dura to inspect for a possible laceration of the brain. Located on the cortex of the left frontal lobe of the brain near the olfactory nerve was a 10 millimeter cut. The olfactory nerve was undamaged. A 7 millimeter piece of bone was located and removed from the laceration.
The section of bone was placed back into the opening. The scalp was sutured and stapled closed.
Dr. Nadell testified that the scar was expected to eventually result in a very thin whitish pin line about the width of the thickness of a nickel.
Post surgical trauma consisted of swollen eyes which peaks in about 2 days and then subsides. This swelling is normal following surgery in the forehead area.
Approximately one week following surgery the staples were removed. Dr. Nadell explained that this procedure is relatively painless as the scalp is still numb from the surgery. He stated that when children cry it is out of fear rather than pain. The staples are removed with a staple remover which takes about one second per staple. At this time Dr. Nadell noted there was no swelling of the eyes and Rachel's eye movements were normal.
Rachel returned three weeks later at which time, Dr. Nadell noted the scar was healing well. Overall Rachel was recovering "quite well". Mrs. Mayer was advised to let Rachel engage in all her normal activities.
Rachel returned in two months. Her scar had completely healed. All vision and eye movements were normal. At this time Dr. Nadell discharged Rachel. He stated he did not anticipate any residual from her injurythat isno obvious focal neurological problems.
Dr. Nadell saw Rachel again approximately one year following surgery. No problems of any kind were noted.
Dr. Nadell testified that his medical file showed no notations that any additional surgery was needed on the scar.
On cross-examination, Dr. Nadell was questioned extensively as to the pain associated with the surgery as well as the possibility of epilepsy or seizures as a residual effect of the injury. In response, he testified that the area of the brain where the injury occurred is called the "silent area" in that no specific higher functions are performed by that area. Dr. Nadell stated that at most, this area may have something to do with the interpretation of smell. He further testified that surgery on the brain is painless because the brain does not have any sensation. The only pain associated with this type of surgery is associated with the scalp and the dura. Often the nerves to the scalp are cut so that the scalp has no sensation. He stated that with brain surgery, discomfort or headaches usually occur because of swelling of the brain. With Rachel's surgery, however, he testified that he did not anticipate any swelling.
With respect to seizures or epilepsy, Dr. Nadell testified that the chance of these is very low because this area of the brain is not a highly epileptic or irritative area. Seizures associated with brain injury usually occur within six months and at the latest two years from the date of injury.
Dr. Nadell testified that he was unaware of any psychological damage to Rachel. Her hair would grow back between three and six months. She was given Tylenol for pain and discomfort and the antibiotics were stopped after 2½ days.
*336 Dr. Nadell testified that the photo shown to the jury was that of Rachel when she was in the acute phasethe first week following surgery. The staples had not been removed and her eyes were still swollen. From the photo he was unable to give a diagnosis as to how the scar would heal cosmetically.
Mrs. Mayer testified that the scar is about the width of a nickel and can be covered by Rachel's hair. She stated it still shows somewhat if her hair is pulled back such as in a ponytail.
It is argued that Rachel's experience will have lasting psychological effects. However, there is no evidence to substantiate this claim. Further there is no evidence to substantiate any future medical expenses,[3] including possible cosmetic surgery because of Rachel's scars. From the record, we conclude that Rachel's only permanent reminder of the accident will be a small scar above her eyelid, and the surgical scar across the top of her head. The photograph in the record was taken shortly after the surgery, and shows Rachel's scar prior to the staples being removed. And, although it presents a disturbing appearance, the testimony indicates it was vastly improved by the trial date. Rachel did not appear at trial nor were any later photographs introduced, although there is testimony the scar may be hidden by Rachel's hair. There is no other evidence to indicate the size of the scar or whether future cosmetic surgery will be required.
We have reviewed the various cases cited by all parties with respect to damage awards, and conclude that $125,000.00 is reasonable under the particular facts and circumstances of this case. We believe that a child of tender years is more susceptible of being traumatized by this experience than would an adult. In addition, there is evidence that the surgical scar will be permanent and, more probably than not, Rachel will be conscious of it throughout her life.
DECREE
For the reasons assigned, we render judgment in favor of Earl Mayer, on behalf of his minor daughter, Rachel Mayer, and against Tulane Medical Center in the amount of $125,000.00, plus legal interest from judicial demand, and all costs. We render judgment on the third party demand in favor of Tulane Medical Center and against Diane Mayer for 20% of the principal award, plus legal interests and all costs.
REVERSED AND RENDERED.
NOTES
[1] We note that $312,500.00 reduced by 60% (Diane Mayer's fault) is $125,000.00, the amount of the original award.
[2] In further support of their argument Tulane, in connection with post trial motions, filed affidavits from nine jurors which indicate their intent to award $125,000.00. However, these responses are opposite from their initial response, on the record, that that figure was after being reduced by 60%. Because of our conclusion in this case based on the trial transcript, we do not consider these affidavits. See, Conner v. Florida Farm Bureau Casualty Insurance, 446 So.2d 383 (La.App. 3rd Cir.1984).
[3] All medical expenses incurred to trial were paid by Tulane.