716 So.2d 110 (1998)
Jessie N. MUSE, et al., Plaintiffs-Appellants,
v.
Chandler E. DUNBAR, et al., Defendants-Appellees.
No. 97-582.
Court of Appeal of Louisiana, Third Circuit.
June 10, 1998.
*112 Miles A. Matt, Lafayette, for Jessie N. Muse and Melba S. Joubert.
Chandler E. Dunbar, et al., for Chandler E. Dunbar, et al.
Molly Gooch, pro se.
Patrick A. Juneau Jr., Barry L. Domingue, Lafayette, for New Hampshire Insurance Company.
Terry L. Rowe, Lafayette, for State Farm Fire and Casualty Insurance.
Before DECUIR, PETERS and GREMILLION, JJ.
DECUIR, Judge.
This is an appeal from the jury's verdict which found that the defendants, Molly Gooch and Edwin Devillier a/k/a Eddie Nyce, were at fault in causing the death of Jessie N. Muse, Jr. For the following reasons, we affirm.

FACTS
On May 1, 1992, Molly Gooch, age 20, and Edwin Devillier, age 19, left Abbeville in Gooch's car and drove to Washington, Louisiana, to spend the weekend at the home of Devillier's grandmother. Upon learning that the grandmother was not home, they drove to Opelousas to ask Devillier's friend, Jessie Muse, Jr., age 17, whether he wanted to accompany them to the Crawfish Festival in Breaux Bridge. Muse told them that he did, but asked them to return in half an hour so that he could finish eating. While they were gone, Jessie asked his mother, Melba Joubert, for permission to go with Devillier and Gooch. Because Devillier was a distant cousin and long-time friend, Joubert consented. In the mean time, Gooch and Devillier drove to Chandler Dunbar's house in Opelousas to buy marijuana. Dunbar, age 21 and Devillier's trade school classmate, had none, but asked for a ride to his girlfriend's house in Lafayette. Devillier and Gooch agreed and drove to get Muse at his mother's house. Dunbar sat in the rear seat behind Gooch, and Muse sat in the rear seat behind Devillier. Along the way, the group stopped and purchased beer and drank it in the car.
During the course of the evening, Devillier showed Dunbar a loaded pistol which Gooch kept in her car. Shortly thereafter, Dunbar asked to return to his house to get some music, and everyone agreed. After Dunbar returned to the car, and as Devillier was driving away, Dunbar displayed a gun of his own. Devillier looked at the gun and referred to it disparagingly as a little "pea shooter." The group then proceeded to Country Corner to buy more liquor. Dunbar waited alone in the car. When the group got back on the road, Gooch began handing out a prescription medication and over-the-counter medication known as "Mini Thins," which she had in her possession.
The next stop for the group was the Cracker Barrel in Lafayette. On the way there, Dunbar revealed that he had been with a gang known as the "Crips" in Houston. Devillier testified that he became edgy after hearing this because of the gang's reputation. In any event, when the group arrived at Cracker Barrel, everyone except Gooch went into the store. Devillier and Muse returned to the car while Dunbar made a phone call. Gooch complained to Devillier that Dunbar was fondling her while they were driving, and Muse confirmed the fondling. In the course of this conversation, Devillier noticed that Gooch's gun was now unloaded. Devillier, Gooch, and Muse discussed that fact and determined that Dunbar had unloaded it. Despite Devillier and Gooch's concern about Dunbar's inebriated state, past violent associations, inappropriate treatment of Gooch, and his unloading the gun, they made no effort to leave Dunbar. Instead, when Dunbar returned to the car, *113 Devillier confronted him about the loaded gun. Dunbar responded in an agitated manner, and Gooch tried to defuse the situation. Devillier proceeded a few miles down the road to the apartment complex where Dunbar's girlfriend lived.
When the group arrived at the apartments, a scuffle broke out in the rear seat, and Dunbar shot Muse twice. Devillier jumped out of the car, and Dunbar jumped behind the wheel, holding a gun on Gooch and threatening to kill her if she tried to leave. Devillier ran to the apartment building and called the police. Dunbar drove off and asked Gooch to remove her pants, whereupon he fondled her genitals. He then stopped in a remote area, raped Gooch, and started driving again. At his request, Gooch performed oral sex on Dunbar as he drove. Shortly thereafter, he stopped in another remote area where he raped Gooch again. After the second rape, Dunbar was startled by car headlights and fled the scene. Gooch sat in the car, smoked four cigarettes, and then left to find help. Sometime during these events, Muse died in the backseat from the gunshot wounds. Dunbar was subsequently convicted of manslaughter for the killing of Muse.
The plaintiffs, Jessie N. Muse and Melba S. Joubert, brought wrongful death and survival actions against Dunbar, Devillier, and Gooch for the death of their son. Also named as defendants were State Farm Fire and Casualty Company, the provider of a policy of homeowners insurance to Gladys Gooch, Molly Gooch's aunt, and New Hampshire Insurance Company, the provider of a policy of homeowners insurance to Kent Nyce, Devillier's step-father. Prior to answering and before trial, Chandler Dunbar was dismissed by motion of the plaintiffs in July of 1994.
After presentation of the evidence, the jury returned a verdict finding the defendants at fault in causing the death of Muse and apportioned fault as follows: sixty percent to Dunbar, twenty percent to Devillier, and the remaining twenty percent to Gooch. The jury also found that on the day Muse died, Gooch was a resident of the household of Gladys Gooch and that Devillier was a resident of the household of Kent Nyce. The jury awarded $100,000.00 in compensation for Muse's pain and suffering. Joubert was awarded $10,000.00 for funeral expenses and $100,000.00 for the loss of her son's love, affection, and services.
The plaintiffs appealed, assigning as error the following:
1. The trial court erred in submitting a jury interrogatory which allowed quantification of fault to an intentional tortfeasor.
2. The trial court erred by failing to award any damages to Jessie N. Muse for the loss of his son.
3. The trial court erred in its damage and medical expense award to Joubert.
4. The trial court erred in its award for Jessie Muse, Jr.'s survival damages.
5. The trial court erred in entering judgment against the defendants for only 40% of the recoverable damages.
6. The trial court erred in assessing expert witness fees.
State Farm answered the appeal, alleging that the trial court erred in assigning any fault to Gooch and awarding $100,000.00 for the pain and suffering of Jessie N. Muse, Jr. Likewise, New Hampshire Insurance Company answered, alleging that the trial court erred in allocating fault to Devillier.

THE FAULT OF DEVILLIER AND GOOCH
State Farm and New Hampshire argue on appeal that the jury erred in assessing fault to Devillier and Gooch. For the reasons that follow, we disagree.
"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ.Code art. 2315. The standard negligence analysis employed to impose liability under this article is the duty/risk analysis which requires the plaintiff to prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard; (2) the defendant failed to conform his or her conduct to that standard; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's *114 substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages to the plaintiff occurred. Roberts v. Benoit, 605 So.2d 1032 (La.1991).
Our first inquiry, therefore, is whether Gooch and Devillier owed a duty to protect Muse from the harm that occurred. Whether or not a duty exists in a particular set of circumstances is a question of law for the court to decide. Generally, there is no duty to control or warn against the criminal actions of a third person so as to prevent him from causing physical injury to another, unless some special relationship exists to give rise to such a duty. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984). Courts have traditionally found such relationships to exist between parent and child; employer and employee; carrier and passenger; innkeeper and guest; shopkeeper and business visitor; restaurateur and patron; jailer and prisoner; and teacher and pupil. Strickland v. Ambassador Ins. Co., 422 So.2d 1207 (La.App. 1 Cir.1982).
Although the plaintiffs do not claim that any of the above relationships are applicable, they do insist that the defendants owed a duty because Muse was a minor who was entrusted into their care and was a guest passenger in the automobile. To support their claim, the plaintiffs cite Bordelon v. Pelican State Mut. Ins. Co., 599 So.2d 511, 513 (La.App. 3 Cir.1992), in which this court stated:
A person who undertakes the control and supervision of a child has a duty to use reasonable care to protect the child from injury. Such a person is not the insurer of the safety of the child, but is required to use reasonable care commensurate with the reasonably foreseeable risk of harm.
While it is true that in most instances the cases regarding this duty have involved an adult supervising a young child, the law clearly designates an age of majority. La. Civ.Code art. 29. As such, seventeen year old Jessie Muse was a child in the eyes of the law. Likewise, under the law, both Gooch and Devillier were adults. We are mindful that the case before us is an unusual one in that the age difference between the child and the supervising adults is very small. However, we decline to make hard facts into bad law by deviating from the bright line standard provided by the legislature.
Accordingly, we find that the defendants breached their duty of care and supervision owed to Muse when they went to procure drugs and brought Muse into contact with a drug supplier. Furthermore, by introducing a loaded gun into a situation where alcohol was being consumed, and by Gooch dispensing prescription and over-the-counter medication like candy, Devillier and Gooch may have prompted Dunbar to obtain the murder weapon when he stopped to get the music. Likewise, Devillier's disparaging reference to Dunbar's gun as a "little pea shooter" could have provoked Dunbar into using more force than might have otherwise been necessary to accomplish the crimes he intended. Finally, and perhaps most importantly, Devillier and Gooch became uncomfortable with Dunbar's behavior, his past violent associations, and the unloading of Gooch's gun, but they chose not to leave him at the Cracker Barrel when they clearly had the opportunity to do so. Instead, Devillier initiated a confrontation which ended only minutes before the fatal incident.
Therefore, the only remaining question is whether the defendants could have reasonably anticipated the attack on Muse with sufficient time to prevent it. For at least three reasons, we find the defendants could have reasonably anticipated the events that transpired. First, given the generally violent nature of the drug business, the defendants could have anticipated that a known drug supplier might be prone to violent behavior. Secondly, Devillier, who had antagonized Dunbar with his comment about the gun, became edgy upon learning of Dunbar's past affiliation with the "Crips" because of his knowledge of this gang's dangerous and violent reputation. Finally, Devillier and Gooch discovered that Dunbar had unloaded Gooch's gun, leaving himself as the only armed party in the vehicle. Immediately thereafter, the defendants had a perfect opportunity to extricate themselves and Muse from the situation. Instead of availing themselves of the opportunity, Devillier confronted *115 Dunbar. Based on these facts, it is clear Devillier and Gooch could have reasonably anticipated violent and dangerous behavior by Dunbar with sufficient time to take preventive action.

COMPARATIVE FAULT: INTENTIONAL AND NEGLIGENT TORTFEASORS
Muse and Joubert contend that the trial court erred in allowing the jury to compare the fault of Chandler Dunbar, an intentional tortfeasor, with the fault of Devillier and Gooch, negligent tortfeasors. For the reasons that follow, we disagree.
In support of their contention, Muse and Joubert argue that Veazey v. Elmwood Plantation Associates, Ltd., 93-2818 (La.11/30/94); 650 So.2d 712, prohibits the comparison of fault between intentional and negligent tortfeasors in the present situation. Veazey involved a tenant in an apartment complex who was raped. She had been assured by the landlords that they provided security and that the area was safe. However, to the contrary, the landlords failed to disclose numerous other reported crimes and failed to provide adequate security. The court ultimately concluded that under those circumstances and in light of the public policy considerations, it was inappropriate to compare the fault of the rapist with the negligence of the landlords.
In reaching this conclusion, the court in Veazey discussed at length the principle of comparative fault as it is applied in Louisiana. The court concluded that "... the concept of comparative fault as it exists in Louisiana is broad enough to encompass the comparison of intentional acts and negligence in appropriate factual circumstances..." Id. at 718-19. The court found that in determining whether to apply comparative fault principles to a particular case, courts should apply the same case-by-case analysis that is applied in a strict liability setting.
The Veazey court enunciated three categories of public policy concerns that should be considered by the trial court when making its determination:
1. Does the scope of the duty to the plaintiff encompass the exact risk of the occurrence which caused damage to the plaintiff? Id. at 719.
2. Will the application of comparative fault principles reduce the incentive of the negligent tortfeasor to protect against the same type of situation occurring in the future "[g]iven the fact that any rational juror will apportion the lion's share of the fault to the intentional tortfeasor when instructed to compare the fault of a negligent tortfeasor and an intentional tortfeasor"? Id.
3. Because the nature of intentional torts and negligent torts are fundamentally different, is this one of those many circumstances when a true comparison of fault between the two just is not possible? Id. at 719-20.
Addressing the three categories in order, we have already found that Devillier and Gooch owed a duty to the plaintiffs by virtue of their taking on the supervision of the minor victim. Devillier and Gooch violated that duty by introducing a drug supplier with a violent history into the situation, by antagonizing that same drug supplier, and by failing to take action to remove the minor from the situation. Finally, we concluded that the scope of their duty encompasses the exact risk that the minor would become the victim of a violent criminal act.
Addressing the second category, we find that allowing the jury to compare the fault of the intentional tortfeasor to the negligence of the defendants would not reduce the incentive of the defendants to protect against the same type of situation occurring in the future. In fact, we believe such policy considerations are precisely what distinguishes this case from Veazey. In Veazey, the court was faced with an individual intentional tortfeasor and a negligent corporate tortfeasor. While the jury's apportionment of fault in this case would seem to dispute the Veazey court's contention that any rational jury would apportion fault in a manner that would act as a disincentive to corrective action, we can understand where such considerations are appropriate in corporate or institutional contexts. Such entities are policy-making bodies and capable of affecting the actions of numerous individuals.
*116 In the present case, no such considerations apply. Comparing fault between negligent individuals such as the defendants and an intentional tortfeasor will not be a disincentive for the defendants to take corrective action in the future. The horror of the death of his friend and the rape of his girlfriend will surely do more to correct Devillier's action than a draconian civil award that ignores the most responsible party. Likewise, the horror of her own multiple rape will more than adequately insure appropriate circumspection in the future for Gooch. Moreover, we do not believe that refusing to compare fault in this situation would serve as a deterrent for individuals similarly situated. Therefore, comparing fault in this case will do no more than assure that fault is attributed to the parties in proportion to their actions.
Finally, we must consider whether this is a case where, because of the fundamental difference in intentional and negligent torts, a true comparison of the two is just not possible. We do not believe this to be such a case. This is a case of human frailty on all sides. No corporate or institutional indifference clouds the issue. No guilty party slithers away aloof and untouched by the horror of the events if fault is compared. The jury verdict in this case proves that the system works. The jury took a level-headed approach to the matter before the court. While its award does apportion the majority of the fault to the intentional tortfeasor, it is overall a balanced result that calls into question the Veazey court's apparent lack of faith in juries.
Accordingly, applying the policy considerations enunciated in Veazey, we find that this is one of the factual circumstances where the comparison of fault between negligent and intentional tortfeasors is appropriate.

FAILURE TO AWARD DAMAGES TO JESSIE MUSE, SR.
Jessie Muse, Sr. contends the jury erred in failing to award any damages to him for the loss of his son. We disagree.
The standard of review to determine whether a trial court erred in awarding damages is set forth in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. When the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances, the appellate court should increase or reduce the award. Id. at 1257. In determining whether a particular determination is reasonable, we are aware that "[t]he trier of fact, actually hearing and observing the witnesses give live testimony, is in a better position to evaluate credibility than a reviewing court, which at best can only study the written words of the cold record." Burbank v. LeBeouf, 471 So.2d 980 (La.App. 1 Cir.1985). "The awards for damages in a wrongful death action may differ among the plaintiffs on the basis of differing degrees of affection which existed between the deceased and the different plaintiffs." Buckbee v. Aweco, Inc., 626 So.2d 1191, 1198 (La.App. 3 Cir.1993), writ denied, 93-2691 (La.1/13/94); 631 So.2d 1162. Moreover, it is well settled that in awarding damages for loss of society and companionship, Louisiana courts take into consideration the closeness of the family relationship. Mathieu v. State, Dep't of Transp. & Dev., 598 So.2d 676 (La.App. 3 Cir.), writ denied, 600 So.2d 665 (La.1992)
In the present case, Mr. Muse testified to his long and loving relationship with his son and his subsequent grief resulting in his placement in a psychiatric hospital. However, his testimony also revealed that he could not recall seeing his son for the first ten months of his life. From ten months to two years, Mr. Muse saw his son sporadically on a drop-in basis. After allegations that Mr. Muse abused Jessie, his visitation was limited by the court to once a month with third-party supervision. Mr. Muse testified that from 1980 through 1987 he saw his son "a little on and off." Moreover, he indicated that he was unaware of his son's hospitalization in a psychiatric ward in November and *117 December of 1990. Mr. Muse testified that he did not see his son a lot during his son's teenage years and, in fact, the last time he saw him prior to his death was a chance meeting at a Mardi Gras Festival.
The jury was presented with both Mr. Muse's sanitized version of events on direct examination as well as his reluctant admissions elicited on cross-examination. It was presented evidence of Mr. Muse's psychiatric hospitalization. The jury was also presented with evidence of significant unrelated turmoil in Mr. Muse's life, including the sexual molestation of his daughters by his father, marital problems, and financial difficulties. Under these circumstances, we cannot say that the jury abused its vast discretion in failing to award damages to Jessie Muse, Sr.

DAMAGE AWARD TO MELBA JOUBERT
By this assignment, Melba Joubert contends that the jury erred in awarding her only $100,000.00 for the wrongful death of her son.
In appellate review of general damage awards, the court must accord much discretion to the trial court judge or jury. Reck v. Stevens, 373 So.2d 498 (La.1979). Only if the reviewing court determines that the trial court has abused its "much discretion" may it refer to prior awards in similar cases and then only to determine the highest or lowest point of an award within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976).
The jury in this case was presented with a very troubled family on all levels. Joubert's psychological difficulties and her apparent lax supervision over her son and his activities could have caused the jury to question the strength of the relationship. The jury, having seen the individuals in person and heard their testimony made a decision in its discretion. After thorough review of the record, we find no abuse of discretion in the jury's award. However, Joubert properly asserts that the trial court erred in failing to submit $3,355.00 in medical expenses to the jury. We find the record supports these expenses and amend the judgment to award Joubert $3,355.00 in medical expenses.

SURVIVAL DAMAGES
Plaintiffs next contend that the jury erred in awarding only $100,000.00 as survival damages. State Farm contends the award should be reduced to $35,000.00. As noted previously, the jury has vast discretion in awarding damages. Given the lay and medical evidence presented regarding Jessie Muse's injuries and his survival thereafter, we cannot say that the jury abused its discretion. Accordingly, these assignments have no merit.

LA. CIVIL CODE ART. 2324: SOLIDARY LIABILITY
Muse and Joubert contend that the trial court erred in awarding judgment against the defendants for only 40% of recoverable damages rather than the 50% mandated by La.Civ.Code art. 2324. We agree.
The plaintiffs initially filed suit against the present defendants and Chandler Dunbar. Dunbar never answered, and the plaintiffs dismissed him from the suit without prejudice. The remaining defendants subsequently filed third-party demands against Dunbar. The primary issue for our review is the effect of plaintiffs' dismissal of Dunbar prior to trial.
The defendants argue that by releasing Dunbar the plaintiffs defeated the defendants' rights to contribution and therefore may only recover the 40% of recoverable damages assigned to the defendants. Louisiana law is clear that when a victim settles with a tortfeasor, the remaining defendants lose their right of contribution against the settling tortfeasor and, therefore, the victim's recovery must be reduced by the proportionate share of the settling tortfeasor. Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La.6/30/95); 657 So.2d 975. However, in this case, the plaintiff did not settle with a tortfeasor. Instead, Dunbar was released without prejudice. A voluntary dismissal, without prejudice, restores matters to the status occupied before the suit was instituted and leaves the party free again to come into court with his complaint. Total Sulfide *118 Servs., Inc. v. Secorp Indus., Inc., 96-589 (La.App. 3 Cir. 12/11/96); 685 So.2d 514.
The defendants next argue that the dismissal of Dunbar is the equivalent of a release because the plaintiffs' action against Dunbar is prescribed. This argument lacks merit. Plaintiffs timely filed suit within the prescriptive period against all defendants. Prescription against Dunbar was, and is, interrupted by plaintiffs' timely suit against the present defendants who are solidary obligors with Dunbar. Spott v. Otis Elevator Co., 601 So.2d 1355 (La.1992).
Finally, the defendants in this case filed third-party demands against Dunbar to preserve their rights. In so doing, they chose the path suggested by the supreme court in a footnote to Cavalier, 657 So.2d at 982 n. 5.
Accordingly, because Devillier, Gooch, and Dunbar are solidary obligors, plaintiffs are entitled to judgment for 50% of recoverable damages under the provisions of La.Civ.Code art. 2324.

EXPERT WITNESS FEES
By their final assignment, Muse and Joubert contend the trial court erred in awarding only $1,025.00 in expert witness fees when $6,102.50 in fees were submitted by plaintiffs. We disagree.
The trial court is vested with much discretion in setting expert witness fees and assigning them as costs, and appellate courts are not permitted to change such awards unless the record on appeal reveals a serious abuse of discretion. Johnson v. Manuel, 95-913 (La.App. 3 Cir. 1/31/96); 670 So.2d 273, writ denied, 96-0540 (La.4/19/96); 671 So.2d 919. Moreover, the amount charged by an expert is not conclusive in fixing the amount of his fee. Landry v. Central Indus. Inc., 592 So.2d 478 (La.App. 3 Cir.1991), writ denied, 593 So.2d 381(La.1992).
In the present case, a contradictory hearing was held on the matter, and both sides presented argument. Under the circumstances, we cannot say that the award of expert witness fees, while admittedly low, was an abuse of discretion.

INSURANCE COVERAGE: DEVILLIER
New Hampshire contends on appeal that the jury erred in finding that its policy provided coverage for Devillier. Plaintiffs filed a Motion to Strike this assignment as not properly before the court. Plaintiffs' motion to strike was referred to the merits.
In its answer to appeal, New Hampshire alleges only that the trial court erred in allocating fault to Devillier. The answer to appeal is limited by its terms to the issue of fault. Therefore, we hold that the issue of coverage under the policy is not before us on appeal. See Koncinsky v. Smith, 390 So.2d 1377 (La.App. 3 Cir.1980); La.Code Civ.P. art. 2133.

DECREE
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the trial court is amended to include an award of $3,355.00 in medical expenses to Melba Joubert, thereby increasing the total judgment to $213,355.00, together with legal interest thereon, from date of judicial demand until paid. The judgment is further amended to reflect that plaintiffs are entitled to judgment against defendants in conformity with La.Civ.Code art. 2324 in the amount of 50% of the recoverable damages to wit: $106,677.50. In all other respects, the judgment of the trial court is affirmed.
AFFIRMED AS AMENDED.
GREMILLION, J., dissents and assigns written reasons.
GREMILLION, Judge, dissenting.
A review of the cases relied on by the plaintiffs and the majority reveals that the standard as stated in Bordelon v. Pelican State Mut. Ins. Co., 599 So.2d 511 (La.App. 3 Cir.1992), is applicable to an adult supervising a young child, not a seventeen year old such as Muse. In Bordelon, the owner of a seafood restaurant was held liable for the injuries suffered by a six-year-old child for allowing the child to continually jump from a porch which was under construction. In Mayer v. Tulane Medical Ctr., 527 So.2d 329 *119 (La.App. 4 Cir.1988), the court found the defendant 80% at fault for the damages suffered by a two-year old child injured while playing in a playroom provided and supervised by the medical center. The court in Ladner v. Firemen's Ins. Co. of Newark, 519 So.2d 1198 (La.App. 2 Cir.1988), found a landowner 50% at fault for the damages suffered by a twelve-year-old motorcyclist for failing to flag or barricade a fence in the middle of a motorcycle trail. Finally, in Williams v. Allstate Ins. Co., 268 So.2d 290 (La.App. 2 Cir.1972), the court found the driver of a pickup truck free from fault for the damages to an eight and one-half-yearold boy who either jumped or was thrown from the bed of the truck. The court based its decision on the fact that, under the circumstances of the case, it was not reasonably foreseeable that the child would jump from the truck while it was moving.
Clearly, the gist of these cases is that when adults accept the responsibility of supervising a young child, they have a duty to use reasonable care under the circumstances because the adults are able to recognize dangers more easily than a young child because of the advantage of their experience. Furthermore, none of these cases deal with an injury caused by the intentional, criminal act of another. I would decline to extend this duty to apply to situations where nineteen and twenty-year-olds are accompanied by a seventeen-year-old.
The plaintiffs also assert that Gooch, as the owner of the car, and Devillier, as the driver, owed a duty to Muse to operate and use the automobile in an ordinarily prudent and reasonable manner so as to protect such a passenger against any unreasonable risk of harm. While such a duty does exist, it is my opinion that the duty does not extend to the particular harm visited on Muse. There must be an ease of association between the complained of actions of Devillier and Gooch and the fatal injury to Muse. Hill v. Lundin & Assocs., Inc., 260 La. 542, 256 So.2d 620 (1972). Here, the correlation between their actions and Dunbar's are nebulous at best. Even in relationships that require a much higher standard of care than that applicable to Gooch and Devillier, liability would only attach if there was sufficient evidence to demonstrate that they could have reasonably anticipated Dunbar's attack upon Muse. Rodriguez v. New Orleans Pub. Serv. Inc., 400 So.2d 884 (La.1981). In Rodriguez, the supreme court declined to hold the defendant labile for injuries sustained by a fourteen-year-old passenger as a result of a battery committed upon him by another passenger. In doing so, the court rejected the use of the "highest degree of care" standard required of common carriers in transporting passengers because of the lack of any connexity between transportation by public carriers and batteries upon passengers. The court refused to apply this high standard even though the assailant uttered insulting words at the victim for approximately twenty blocks before committing the battery. The court held the defendant to the same duty as a business establishment: keep the premises safe from the unreasonable risks of harm and warn persons of the known dangers. Id. at 887. Where the intentional tort or criminal act of a third person constitutes the unreasonable risk of harm, the duty does not require the proprietor to risk physical injury or criminal or civil liability by intervention, but only to summons the police at the time the proprietor knew or should have known of the third person's intentions and apparent ability to inflict the harm. Id.
Under this analysis, the only remaining question is whether the defendants could have reasonably anticipated the attack on Muse with sufficient time to prevent it. I do not believe that there was sufficient evidence available to either Devillier or Gooch that would allow a reasonable person to anticipate the intentional, criminal actions of Dunbar. In fact, Gooch testified that before the day of this incident, she had never met Dunbar. Devillier testified that during the time he knew him, he never witnessed any behavior that would indicate that Dunbar was violent. However, once this tragic event was set into motion, Devillier did what any reasonable person would do: he sought the help of the police. Unfortunately, Gooch was prevented from doing anything by Dunbar.
I see no reason and know of no legal principle which would impose a higher standard *120 on a social host to an invited guest (even a minor guest) than that imposed on a common carrier who invites the public to do business with them. As such, I would decline to impose a duty on a social host to protect their guests from the intentional, criminal acts of third parties absent any reasonable indication that the criminal act is foreseeable. Our colleagues in the Second Circuit articulated this in Haskins v. State Farm Fire & Cas. Co., 612 So.2d 990 (La. App. 2 Cir.1993). In Haskins, the parents of a murdered teenager sued two of their son's friends, Paul Wile and Sean Parker. On the day prior to the murder, Marlon Wallace told the two friends that because he could not repay a debt that he owed the victim, he was going to shoot him. Wile and Parker did not inform the victim of the threat and Wallace did indeed shoot and kill Haskins. The court found that because they did not know Wallace to be a violent person and did not take the threat seriously, they owed no duty to warn or protect Haskins from the criminal actions of Wallace. Again, it is my opinion that there was insufficient evidence which would lead Devillier or Gooch to reasonably anticipate that Dunbar would ultimately shoot Muse. For this reason, and those set out above, I would reverse the jury's finding that Gooch and Devillier were at fault in the death of Jessie Muse, Jr. Therefore, I respectfully dissent.