Julie SLACK and Brett
Slack, Petitioners,

v.

FARMERS INSURANCE EXCHANGE, a
California corporation, Respondent.

No. 98SC812.

Supreme Court of Colorado,
En Banc.

June 19, 2000.

Rehearing Denied July 31, 2000.*

* Chief Justice MULLARKEY and Justice BENDER would grant the petition.

Burg, Simpson, Eldredge, Hersh & Houlistan, P.C., Michael S. Burg, Diane Vaksdal Smith, Rosemary Orsini, Englewood, Colorado, Attorneys for Petitioners.

Patterson, Nuss & Seymour, P.C., Franklin D. Patterson, Englewood, Colorado, Attorneys for Respondent.

Campbell, Latiolais & Ruebel, P.C., Jeffrey Clay Ruebel, Denver, Colorado, Attorneys for Amicus Curiae for Colorado Defense Lawyers Association.

Breit, Bosch, Levin & Coppola, P.C., Bradley A. Levin, Denver, Colorado, Roberts & Zboyan, P.C. Thomas L. Roberts, Denver, Colorado, Attorneys for Amicus Curiae for the Colorado Trial Lawyers Association.

Justice KOURLIS delivered the Opinion of the Court.

The question in this case is whether section 13–21–111.5, 5 C.R.S. (1999) requires the pro rata distribution of civil liability among intentional and negligent tortfeasors who jointly cause indivisible injuries.[1] Section 13–21–111.5(1) states that a tortfeasor shall only be liable for damages to the extent of her negligence or fault. The court of appeals, in *Harvey v. Farmers Insurance Exchange*, 983 P.2d 34 (Colo.App.1998) concluded that the statute as drafted by the General Assembly contemplates that liability may be apportioned between a negligent tortfeasor and an intentional tortfeasor. 983 P.2d 34, 39 (Colo.App.1998).[2] The Petitioner here contends that when one of the tortfeasors has committed an intentional act, the negligent tortfeasor should bear the risk of the full loss, rather than having the benefit of an apportioned degree of loss. We disagree, and hold that the plain meaning of the statutory language requires apportionment of liability among negligent and intentional tortfeasors who contributed to an indivisible injury, and thus, we affirm the court of appeals.

## I.

On September 8, 1992, Juliette Diane Slack suffered injuries in an automobile accident. Slack, driving a minivan, was stopped at a stoplight waiting to make a right turn. When she began to make the turn, a young man in a small, green car ran the stoplight and forced Slack to slam on the brakes. The abrupt stop caused Slack to strike her chin on the steering wheel and then to hit the back of her head on the headrest.

The following day, Slack visited her chiropractor, Dr. Steven Lee Schuster, for treatment of her neck and back pain caused by the accident.[3] Dr. Schuster submitted all charges for treatment to Slack's insurer, Farmers Insurance. In accordance with her policy, and at the request of Farmers Insurance, Slack signed and delivered to Farmers Insurance an Application for Benefits and Proof of Loss requesting Personal Injury Protection (PIP) benefits under her automobile insurance policy. Farmers Insurance elected to obtain a second opinion regarding the nature of Slack's injuries from an independent medical examiner (an IME).

Farmers Insurance scheduled an appointment for Slack with Dr. Lloyd Lachow, a chiropractor. At that time, another one of Farmers' insureds, Jodi Lynn Harvey, had claimed that Lachow sexually assaulted her during an examination.[4] Slack testified that during her exam, Lachow touched her clothed breast and pushed his pelvis into her back. In addition, she testified that he pulled hard on her neck and shook her head violently from side-to-side, putting her in additional pain.

1. We granted certiorari on three issues:
   (1) Whether the court of appeals erred as a matter of law in ruling that the intentional fault of a nonparty tortfeasor, who owed no duty to plaintiffs, could be compared to the negligence of a defendant who owed a duty of good faith and fair dealing to the plaintiffs.
   (2) Whether the court of appeals' opinion must be reversed because it derogates an insurer's duty of good faith and fair dealing in violation of this court's prior decisions and further violates public policy.
   (3) Whether the court of appeals' opinion with respect to the jury verdict in favor of Brett Slack must be reversed because the court addressed an issue that had not been properly preserved in the trial court.

2. The case before us today arises under a different title than its predecessor because plaintiff Harvey did not petition this court for a writ of certiorari.

3. Dr. Schuster had been treating Slack since August 1992 for mid-back pain.

4. The incident between Harvey and Lachow occurred in November 1991. Harvey reported it to her claims adjuster at Farmers Insurance, and later filed suit in March 1993 as a coplaintiff in this case. The claims adjuster for Harvey worked out of a different office than the claims adjuster for Slack. At trial, Slack's attorney argued to the jury that Farmers Insurance either knew or should have known of the allegation that Lachow sexually abused patients before it referred Slack to him. The jury returned a verdict for Farmers Insurance on Harvey's claim; the court of appeals affirmed; and because Harvey did not petition for certiorari, her portion of the case is not before us today.

Immediately thereafter, Slack drove to Dr. Schuster's office to confirm that her IME acted inappropriately. She then contacted an attorney and reported the incident to the City of Aurora police department. Later that same day, Slack contacted Farmers Insurance to inform it of the events.

Following an investigation, the Colorado Department of Regulatory Agencies (the Agency) suspended Lachow's license effective March 31, 1993. Lachow admitted in a Stipulation and Final Agency Order that the State Board of Chiropractic Examiners, a Board contained within the Agency, would be able to establish a prima facie case of unprofessional conduct during the examinations of Slack and Harvey.

Slack filed suit against Lachow claiming assault, battery, negligence, extreme and outrageous conduct/intentional infliction of emotional distress, negligent infliction of emotional distress, and malpractice. In the same suit, she claimed negligence, breach of contract, bad faith breach of contract, and outrageous conduct against Farmers Insurance. Slack claimed that Farmers Insurance acted improperly by sending her to a chiropractor it knew or should have known would injure her. Brett Slack, her husband, brought a loss of consortium claim.

Before trial, the Slacks settled their claims with Lachow. Farmers Insurance, however, designated Lachow a nonparty pursuant to section 13–21–111.5(3), 5 C.R.S. (1999).[5] Following a trial, the jury returned a verdict in favor of the Slacks and against Farmers Insurance on the negligence claim, bad faith breach of contract claim, and on Brett's loss of consortium claim. The jury also found that Farmers Insurance acted willfully and wantonly. The jury awarded Slack $40,000 for her injuries and $16,000 in exemplary damages. It awarded Brett $6000 for his loss and $2400 in exemplary damages. The jury apportioned sixty percent of the fault for Slack's injuries to Lachow and forty percent to Farmers Insurance. In accordance

with section 13–21–111.5(1), the trial court reduced Slack's award to $16,000 in compensatory damages and $16,000 in exemplary damages. The trial court did not reduce the compensatory portion of Brett's damage award.

Slack appealed the reduction of her award to the court of appeals. Farmers Insurance cross-appealed the trial court's refusal to apportion the damages awarded to Brett. The court of appeals held in favor of Farmers Insurance on both issues. This appeal followed.

## II.

### A.

■ Slack first argues that section 13–21–111.5(1) does not require apportionment between a negligent actor and an intentional tortfeasor. We disagree.

■ Slack asserts that an IME owes no duty to a patient who has been referred by an insurance company, and that therefore, Lachow cannot be a nonparty tortfeasor in this case. She cites *Martinez v. Lewis*, 969 P.2d 213 (Colo.1998) to this effect where we held that an IME does not owe a duty of care to the examinee to diagnose the examinee's condition correctly because no physician-patient relationship arises from the examination. 969 P.2d 213, 219 (Colo.1998). Slack misinterprets our holding in *Martinez*. As we stated explicitly in *Greenberg v. Perkins*, 845 P.2d 530, 536 (Colo.1993), "the [independent medical] examination itself may be said to create a relationship between the parties and impose upon the physician a duty to exercise a level of care that is consistent with his professional training and expertise." *See also Martinez*, 969 P.2d at 217–18. Therefore, an IME remains liable for any injury he negligently or intentionally inflicts on a patient during an examination, but does not owe the examinee a duty to diagnose correctly his or her condition. It goes without saying that a physician owes all examinees a

5. Section 13–21–111.5(3)(b) provides in part:
Negligence or fault of a nonparty may be considered if the claimant entered into a settlement agreement with the nonparty or if the defending party gives notice that a nonparty was wholly or partially at fault within ninety days following commencement of the action unless the court determines that a longer period is necessary.

duty not to assault them sexually, and would be liable for such conduct. Hence, Lachow was a proper nonparty.

### B.

We move then to the question of whether the jury could properly apportion Slack's damages between Lachow and Farmers Insurance.[6] As part of the tort reform movement in Colorado, the General Assembly eliminated joint and several liability wherein one tortfeasor might be liable in damages for the acts of another tortfeasor, and adopted a several liability scheme, wherein a tortfeasor is responsible only for the portion of the damages that he or she caused. *See Resolution Trust Corp. v. Heiserman*, 898 P.2d 1049, 1054 (Colo.1995); Robert E. Benson, *Application of the Pro Rata Liability, Comparative Negligence and Contribution Statutes*, 23 Colo. Law. 1717, 1717 (1994). Section 13–21–111.5(1) states:

> In an action brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the *negligence or fault* attributable to such defendant that produced the claimed injury, death, damage, or loss. . . .

(Emphasis added.) The General Assembly also provided that the negligence or fault of a nonparty who settled with the plaintiff could be considered in the apportionment of damages. *See* §§ 13–21–111.5(2), –111.5(3).

We are called upon to determine whether the General Assembly intended that liability may be apportioned only between negligent tortfeasors, or also between a negligent and an intentional tortfeasor. In other words, may a jury apportion fault among tortfeasors who were merely negligent and others who intended to do wrong?

**6.** In this case, the jury did not specifically find that Lachow committed an intentional tort because he became a nonparty to the suit after his settlement with Slack. The tendered jury instructions did not force the jury to determine if Lachow acted negligently or intentionally. Instead, the instruction allowed the jury to find that Lachow contributed to Slack's injuries if they were caused by his negligence or fault. Thus, Farmers Insurance argues that Lachow

When interpreting a statute, we proceed in accordance with a number of time-honored principles. First, we adopt the construction that best gives effect to the legislative scheme. *See Water Rights Of Park County Sportsmen's Ranch LLP v. Bargas*, 986 P.2d 262, 268 (Colo.1999). In doing so we must look to the plain meaning of the words employed. See *id.;* see also § 2–4–101, 1 C.R.S. (1999). We construe a statute so as to give effect to every word, and we do not adopt a construction that renders any term superfluous. *See Cherry Hills Resort Dev. Co. v. City of Cherry Hills Village*, 790 P.2d 827, 830 (Colo.1990). Where the statutory language is clear and unambiguous, we do not resort to other rules of statutory construction. *See Vaughan v. McMinn*, 945 P.2d 404, 408 (Colo.1997). The court will not create an exception to a statute that the plain language does not suggest or demand. *See Scoggins v. Unigard Ins. Co.*, 869 P.2d 202, 205 (Colo.1994) ( "We will not judicially legislate by reading a statute to accomplish something the plain language does not suggest, warrant or mandate.").

In accordance with this approach, we first examine the plain meaning of section 13–21–111.5(1) to determine which torts it encompasses. For analytical purposes, the statute can be separated into two parts. The first explains that the statute applies to "an action brought as a result of a death or an injury to person or property." § 13–21–111.5(1). The language of this part clearly applies to a wide variety of situations, and includes intentional torts. Undoubtedly, a sexual assault can result in an action for an injury to a person. Therefore, on its face, the language would cover the intentional torts of assault and battery.

The second part of the statute states "no defendant shall be liable for an amount

should not be considered an intentional tortfeasor for purposes of section 13–21–111.5(1). However, because we find in favor of Farmers Insurance as we have framed this issue for review, we do not address the merits of its argument. By our holding, responsibility may be apportioned between Lachow and Farmers Insurance, whether Lachow's conduct was negligent or intentional.

greater than that represented by the degree or percentage of the *negligence or fault* attributable to such defendant that produced the claimed injury, death, damage, or loss." § 13–21–111.5(1) (emphasis added). The critical portion of this section is the phrase "negligence or fault." If this second part of the statute does not limit the first part, then intentional torts must fall within its reach.

We note that the comparative negligence statute refers only to the negligence of the victim and the negligence of the tortfeasor. *See* § 13–21–111, 5 C.R.S. (1999). On the other hand, the pro-rata apportionment statute that is before us today contains not only a reference to the negligence of a defendant, but also to the "fault" attributable to a defendant. *See* § 13–21–111.5(1). Thus, we cannot ignore the addition of the term "fault" to the statute. *See Cherry Hills*, 790 P.2d at 830.

*Black's Law Dictionary* defines fault as "[a]n error or defect of judgment or of conduct; any deviation from prudence or duty resulting from inattention, incapacity, perversity, bad faith, or mismanagement." *Black's Law Dictionary* 623 (7th ed.1999). As pertinent in this case, *Webster's New Collegiate Dictionary* provides that fault means "misdemeanor" and "mistake" and "responsibility for wrongdoing or failure." *Webster's New Collegiate Dictionary* 414 (1981). *Webster's Third New International Dictionary* defines fault in part as "a failure to do what is right" and "a failure to do something required by law or the doing of something forbidden by law" and "a responsibility for wrongdoing or failure." *Webster's Third New International Dictionary* 829 (1976).

The same sources define negligence more narrowly. *Black's* offers this definition of negligence:

> The failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation; any conduct that falls below the legal standard established to protect others against unreasonable risk of harm, except for conduct that is intentionally, wantonly, or willfully disregardful of others' rights.

*Black's, supra,* at 1056. *Webster's New Collegiate Dictionary* and *Webster's Third New International Dictionary* define negligence as the "failure to exercise the care that a prudent person usually exercises." *Webster's New, supra,* at 762; *Webster's Third, supra,* at 1513.

These definitions suggest that the General Assembly used the word "fault" purposefully in section 13–21–111.5(1) and that the common understanding of that term controls our interpretation. Fault contemplates more than mere negligence, and includes intentional acts.

Interestingly, this court addressed a related issue in *Resolution Trust Corp. v. Heiserman*, 898 P.2d 1049 (Colo.1995). In that case, we answered a certified question from the United States District Court for the District of Colorado about whether "tortious act" meant both negligent *and* intentional acts. *See id.* at 1052. The case involved an action by Resolution Trust Corp. (RTC) against the officers and directors of a savings and loan association that had fallen into receivership. *See id.* at 1052–53. RTC alleged that the defendants engaged in a common plan or design to exercise inadequate oversight, and asserted claims for negligence, negligence per se, gross negligence, and breach of the fiduciary duty of care. *See id.* at 1053. The issue that the court decided was whether those defendants were liable jointly under the terms of section 13–21–111.5(4), 5 C.R.S. (1999) as "two or more persons who consciously conspire and deliberately pursue a common plan or design to commit a tortious act." *See id.* at 1055. One of the defendants argued that the term "tortious act" meant something different from the term "negligence or fault" contained elsewhere in the statute because of the former term's solitary use in subsection four. *See id.* at 1056. We disagreed, opining that,

> the term "tortious act" has a broad definition that encompasses any wrongful conduct. There is no basis to assume that by using the term "tortious act" in section 13–21–111.5(4) the General Assembly for some reason intended to exclude one or more forms of wrongful conduct from the scope of that term.

*Id.* The court then reasoned that the term "tortious act" included both negligent and intentional acts. *See id.* As relevant to our inquiry today, the court concluded that "tortious act" did include "negligence or fault," and included both negligent and intentional acts. Therefore, we implicitly equated "negligence or fault" with negligent and intentional acts.

In short, we can find nothing in the statutes or in our cases interpreting the statutes to suggest that the General Assembly intended to expose a negligent tortfeasor to greater liability when his conduct was coupled with that of an intentional tortfeasor, than when his conduct combined with that of another negligent tortfeasor. Accordingly, we conclude that section 13–21–111.5(1) applies even when one of several tortfeasors commits an intentional tort that contributes to an indivisible injury.

The General Assembly abolished joint and several liability in Colorado "to reduce unfair burdens placed on defendants." *General Elec. Co. v. Niemet,* 866 P.2d 1361, 1364 (Colo.1994). "The adoption of [the prorata division of liability] was intended to cure the perceived inequity under the common law concept of joint and several liability whereby wrongdoers could be held fully responsible for a plaintiff's entire loss, despite the fact that another wrongdoer, who was not held accountable, contributed to the result." *Barton v. Adams Rental, Inc.,* 938 P.2d 532, 535 (Colo.1997). In our view, neither the reasoning nor the result differ when an intentional wrongdoer contributes to the loss.

### C.

Other courts facing this issue have adopted a similar construction. In *Bhinder v. Sun Co.,* 246 Conn. 223, 717 A.2d 202 (1998), the Supreme Court of Connecticut held that the apportionment statute did not apply to situations where one defendant committed an intentional act and another committed a negligent act, because unlike Colorado's law, the Connecticut statute was limited to "negligence actions." However, the court extended the statute to such situations as a matter

of common law. *See id.* at 208. The court noted that failure to apportion "would have the incongruous effect of rendering a negligent party solely responsible for the conduct of an intentional actor, whose deviation from the standard of reasonable care is clearly greater." *Id.* at 210; *see also Roman Catholic Diocese of Covington v. Secter,* 966 S.W.2d 286 (Ky.Ct.App.1998) (interpreting an apportionment statute covering tort actions involving "fault" to allow apportionment between a church operated school that negligently hired and retained an employee that sexually abused a student and the intentional tortfeasor); *Reichert v. Atler,* 117 N.M. 623, 875 P.2d 379 (1994) (holding a tavern owner's negligent failure to protect patrons from foreseeable harm may be compared to the intentional conduct of another tortfeasor); *Field v. Boyer Co.,* 952 P.2d 1078 (Utah 1998) (holding that "fault" as contained in Utah's comparative fault scheme included intentional acts).

### D.

Slack acknowledges that the prorata liability statute would apply were Lachow a mere negligent actor, and that Farmers Insurance would bear only their portion of the liability. She argues, however, that since Lachow was an intentional actor, Farmers Insurance not Lachow should bear a greater proportion of the loss. In our estimation, the public policy rationale for apportioning the loss commensurate with wrongdoing is even more compelling when an intentional tortfeasor contributes to the injury. Under the terms of the statute, a negligent actor is only responsible for his contribution to an injury, irrespective of whether the other tortfeasor accidentally or purposefully injured the victim. To hold otherwise would lead to the anomaly that a negligent tortfeasor would bear the full risk of the injury if the other tortfeasor purposefully injured the victim, but only his portion of the risk if the other actor were negligent. If any disproportionate responsibility were to be assessed, it would more logically fall upon the intentional tortfeasor—not the neg-

ligent one.[7] Nonetheless, section 13–21–111.5 demonstrates the General Assembly's intent that a tortfeasor should pay only for the portion of the injury he caused.

### E.

■ Slack argues that the court of appeals' decision allows an insurer to act in derogation of its duty of good faith and fair dealing. She suggests that the court's holding invites insurance companies to neglect their insureds without the risk of full liability for their actions. Slack contends that apportionment in this case ignores the nature of the duty owed Slack and punishes her by proportionately reducing Farmers Insurance's liability. We find this argument unpersuasive.

The jury specifically found that Farmers Insurance breached its duty of good faith and fair dealing to Slack, and awarded damages accordingly. The jury instructions explained the nature of Farmers Insurance's duty of good faith and fair dealing, and presumably, the jury considered the nature of the duty when it apportioned fault. Clearly, Farmers Insurance has not avoided liability for its improper acts. Rather, in accordance with statute, the jury apportioned liability for the entire injury according to its determination regarding the relative fault of the tortfeasors. Here, the jury even awarded exemplary damages against Farmers Insurance. While our tort scheme limits these damages to some degree, they remain available to a jury when a wrongdoer acts willfully or wantonly. *See* § 13–21–102(1)(a), 5 C.R.S. (1999).

### III.

■ The Slacks also contend that the court of appeals erred in apportioning the damages awarded Brett for loss of consortium because, at trial, Farmers Insurance accepted the jury verdict form that did not include an area for the apportionment of

fault as it related to the consortium claim. We agree with the court of appeals on this point.

■ As the court of appeals determined, a loss of consortium claim falls within the language of section 13–21–111.5(1). *See Harvey*, 983 P.2d at 40. It qualifies as an "action brought as a result of a death or an injury to person or property." § 13–21–111.5(1). Thus, the apportionment rules contained in the statute apply.

■ Brett argues that Farmers Insurance should be estopped from asserting error as to this issue because the jury verdict form for Brett's claim did not include an apportionment question. We disagree because we hold that a party derives a loss of consortium claim from the underlying injury for purposes of apportionment of liability between multiple tortfeasors.

■ A loss of consortium claim is collateral to the personal injury claim for purposes of comparative negligence. *See Lee v. Colorado Dep't of Health*, 718 P.2d 221, 232 (Colo. 1986). This principle also applies in the context of this case. As a result, when a victim suffers an indivisible injury, the apportionment of fault for the loss of consortium must match the apportionment of fault for the underlying injury. In this case, there was no apportionment of liability question on the jury verdict form for Brett's loss of consortium claim. However, had such a question been present, the jury might have apportioned fault as to his claim differently. Any difference in apportionment for the injuries in this case would not have been proper under our law.

The exemplary damage award for loss of consortium in this case suggests that the jury understood this apportionment scheme. The jury awarded $6000 in compensatory damages and $2400 in exemplary damages. The $2400 total is exactly 40% of the $6000 award and the most Brett could have obtained un-

---

7. Consistent with the notion that an intentional tortfeasor is more culpable even than a negligent tortfeasor, and thus, should be subject to increased, not decreased, exposure is section 13–50.5–102(3), 5 C.R.S. (1999) of the Uniform Contribution Among Tortfeasors Act. That section provides that an intentional tortfeasor has no right of contribution from other tortfeasors even in those narrow circumstances in which contribution continues to exist for the benefit of negligent tortfeasors.

der the jury's verdict in this case. Therefore, we find that the trial court erred in failing to apportion the jury award for Brett's loss of consortium claim, and affirm the court of appeals' decision on this issue.

## IV.

The Colorado several liability statute does not differentiate between intentional acts and negligent acts in its mandate to apportion liability among tortfeasors. Accordingly, the trial court properly apportioned liability in this case based upon the jury's decision as to relative fault between Farmers Insurance and Lachow for Slack's injuries, but erred in failing to apportion liability for Brett's loss of consortium. Therefore, we affirm the court of appeals, and remand the case with directions to return it to the district court with instructions to reduce Brett's award of compensatory damages to $2400 in accordance with this opinion and otherwise to reinstate the trial court judgment.

Justice RICE dissents, and Chief Justice MULLARKEY and Justice BENDER join in the dissent.

Justice RICE, dissenting:

The majority concludes that the use of the term "fault" in section 13–21–111.5, 5 C.R.S. (1999), indicates that the General Assembly intended to include the liability of an intentional tortfeasor in the statute. As I believe that the pro rata liability statute was not intended to allow for apportionment of liability between a negligent tortfeasor and an intentional tortfeasor, I respectfully dissent.

The majority concludes that the plain language of the statute is not ambiguous and that the term "fault," as used in the statute, includes intentional torts. In my view, the term "fault" is ambiguous and its intended scope is unclear. Consequently, it is necessary to resort to established rules of statutory construction to discern the intended meaning of this language. I explain below how the legislative history demonstrates that the addition of the term "fault" to the statute was not intended to allow for apportionment of liability between a negligent tortfeasor and an intentional tortfeasor. The majority re-

lies on three different dictionary definitions of the term "fault" as support for its conclusion. I find the use of this authority unpersuasive, particularly in consideration of the circumstances under which the term "fault" was added to the statute. Finally, the majority relies on the General Assembly's objectives in enacting this statute as support for its conclusion. However, construing the statute to preclude a negligent tortfeasor from reducing his liability by comparing his negligence to the actions of an intentional tortfeasor is consistent with the objectives underlying the enactment of the statute as well as with the well-reasoned conclusions of courts in other jurisdictions that have addressed this issue.

## I. THE SCOPE OF SECTION 13–21–111.5

As noted in the majority opinion, section 13–21–111.5 was added as part of the tort reform movement in 1986. The majority asserts that the plain language of the statute is unambiguous. I disagree with the majority's conclusion that the statute is unambiguous on its face because, in my view, the language lends itself to different interpretations.

A court's primary task in construing a statute is to ascertain and give effect to the intent of the General Assembly. *See Van Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070, 1076 (Colo.1992). To determine that intent we look first to the statutory language. *See id.* When the language is clear and unambiguous, there is no need to resort to rules of statutory construction. *See id.* If, however, the language is ambiguous or uncertain as to its intended scope, with the result that the text lends itself to alternative constructions, a court may look to other matters such as the object sought to be attained, the circumstances under which the statute was enacted, the legislative history, the common law or former statutory provisions, and the consequences of a particular construction. *See id.; see also* § 2–4–203(1), 1 C.R.S. (1999). Ambiguity exists when a statute is capable of being understood by reasonably well-informed persons in two or more different senses. *See Allstate Ins. Co. v. Schneider Nat'l Carriers, Inc.*, 942 P.2d 1352, 1355

(Colo.App.1997) (citing 2A N. Singer, *Sutherland Statutory Construction* § 45.02 (5th ed.1992)), *aff'd sub nom. Farmers Ins. Exch. v. Bill Boom, Inc.*, 961 P.2d 465 (Colo. 1998).

Turning now to the pro rata liability statute at issue in the instant case, the language of the statute provides:

> In an *action* brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the *negligence or fault* attributable to such defendant that produced the claimed injury, death, damage, or loss, except as provided in subsection 4 of this section.[1]

§ 13–21–111.5(1) (emphasis added). Because the term "fault" is not defined in the statute, it is unclear from the text of the statute by itself whether this term was intended to include intentional tortfeasors.[2] On its face, the term "fault" can be read to be limited to other types of negligent tortfeasors (e.g., gross negligence). Alternatively, the term "fault" can be interpreted as a modifier of the introductory language "in an action," thus making the statute applicable to actions other than negligence (e.g., products liability). Finally, "fault" can be read to include intentional tortfeasors. Because this language is capable of being understood in more than one sense, we must employ other rules of statutory construction to determine whether this language was intended to include intentional tortfeasors.

## A. Legislative History

The majority relies on the addition of the term "fault" to the statute as evidence that the General Assembly intended to include intentional tortfeasors in the liability apportionment scheme. However, examination of the legislative history of section 13–21–111.5 demonstrates that the addition of the term "fault" to the statute was *not* intended to allow for apportionment of liability between a negligent tortfeasor and an intentional tortfeasor.

The majority states that section 13–21–111.5(1) can be divided into two parts for analytical purposes: (1) the introductory phrase, "In an action brought as a result of a death or an injury to person or property, . . ."; and (2) the remainder of that sentence, which continues, "no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant. . . ."[3] *See* maj. op. at 284. The majority then asserts that the use of the broad language "in an action" indicates that this section "would cover the intentional torts of assault and battery." *Id.* The majority next considers the language "negligence or fault" in the second part of the section and concludes that if this language "does not limit the first part, then intentional torts must fall within its reach." *Id.* at 285.

Contrary to the majority's analysis, the legislative history during the adoption of this section demonstrates that the General Assembly never intended for the pro rata liability apportionment scheme to allow a negligent tortfeasor to reduce his share of liability by comparison to an intentional tortfeasor. The conference committee hearing on this section reveals that the first part of section 13–21–111.5(1), as originally referred to the committee, read as follows, "In any *negligence* action brought as a result of a death or an injury to person or property, . . . ." Hearing on S.B. 70 Before the Conference Committee on Joint and Several Liability, 55th General Assembly, 2d Reg. Sess. (April 29, 1986) (emphasis added). In addition, in the

---

1. Subsection 4 revives the common law rules of joint liability and right of contribution for tortfeasors who "consciously conspire and deliberately pursue a common plan or design to commit a tortious act." § 13–21–111.5(4).

2. Interestingly, the General Assembly used the phrase "negligence or *willful* fault" in the Probate Code. § 15–2–807(2)(b), 5 C.R.S. (1999) (emphasis added). I cite this section as an illustration that in another part of our statutes, the

General Assembly deemed it necessary to use the modifier "willful" to indicate that "fault" was to include intentional actions. This is further evidence that the intended scope of "fault" in the pro rata liability statute is uncertain.

3. I agree that it is useful to analyze these clauses independently to understand the changes that were introduced in the conference committee.

version referred to the committee, subsequent references to the "negligence" of a tortfeasor were *not* followed by the language "or fault," as the statute now reads. *See id.* By using the term "negligence" throughout the statute, and by not including the term "fault," the statute as referred to the conference committee did *not* allow a negligent tortfeasor to reduce his liability by comparison to the liability of an intentional tortfeasor.

A motion was introduced in the conference committee to remove the word "negligence" from the first part of the section. *See id.* The motion sponsor's stated purpose to the committee in proposing this change was to ensure that the statute would also be applied in *actions* involving *gross negligence* and *products liability. See id.* There was no indication that the removal of the word "negligence" was intended to effectuate any other change in the statute. *See id.* This motion was passed without comment. *See id.* Immediately thereafter, a brief discussion ensued regarding the fact that in order to make the entire statute consistent with this modification, another part of the statute would then have to be changed to "negligence *or fault* " by adding the language "or fault" after the use of the term "negligence." *See id.* (committee member commenting that this change "would be consistent with what we just did.").

The clear concern of the committee here was that the failure to add the language "or fault" after the use of the word "negligence" in the statute might defeat the goal of ensuring that the statute would also apply to gross negligence and products liability actions. The conference committee provided *no* indication that these changes were intended to alter the original language of the statute *precluding* a negligent tortfeasor from reducing his liability by comparison to an intentional tortfeasor. *See id.* Moreover, at no time did the committee engage in any discussion indicating that these changes *might* alter the scope of liability apportionment in any fashion. *See id.* It is difficult to believe that the conference committee intended so sweeping a change in the scope of liability apportionment without any discussion or comment to that effect.

Therefore, in my view, the legislative history of section 13–21–111.5 demonstrates rather convincingly that the decision to use the broad language "in an action" at the beginning of subsection (1), and the addition of the language "or fault" after the term "negligence" throughout this section, was never intended by the legislature to lead to the result that a negligent tortfeasor would be allowed to reduce his liability by comparison to an intentional tortfeasor. To the contrary, these changes to the statute were made by the conference committee solely to ensure that the statute would also apply to gross negligence and products liability actions.

### B. Definitions of "Fault"

The majority next relies on three different dictionary definitions of "fault," as well as those dictionaries' corresponding definitions of "negligence," as support for the conclusion that the use of the term "fault" in the statute was intended to include intentional torts. I find the use of this authority unpersuasive on the question of whether the General Assembly intended to include intentional torts through the addition of the term "fault" in the statute.

The majority's use of the dictionary definitions of "fault" and "negligence" does not support the proposition that the General Assembly intended to include intentional torts in the statute because these definitions serve only to illustrate that "fault" is a broader term than "negligence." I do not dispute the majority's contention that "fault" is in fact a broader term than "negligence," or their assertion that "[t]hese definitions suggest that the General Assembly used the word 'fault' purposefully in section 13–21–111.5(1)." Maj. op. at 285. As discussed above, the term "fault" was added by the conference committee to ensure that this section would apply to *actions* based on gross negligence or products liability. Therefore, the term "fault," as used in this section, does, in fact, contemplate more than mere negligence in that it extends the applicability of this statute to gross negligence and products liability actions; but its use does not support the majority's conclusion that it includes intentional torts.

The majority next cites to our decision in *Resolution Trust Corp. v. Heiserman*, 898 P.2d 1049 (Colo.1995), for support. *See* maj. op. at 285. Because our holding in *Heiserman* only resolved the issue of the meaning of the language "tortious act" as used in subsection four of the statute, and did not require us to construe the language "negligence or fault," I find the reference to this authority unpersuasive on the issue before us.

As noted above, section 13–21–111.5(4) revives the common law rules of joint liability and right of contribution when "two or more persons [ ] consciously conspire and deliberately pursue a common plan or design to commit *a tortious act*." (Emphasis added.) This subsection was added to the statute *one year after* the original enactment of the pro rata liability scheme. *See* ch. 102, sec. 1, § 13–21–111.5, 1987 Colo. Sess. Laws 551, 551–552. As noted by the majority, *Heiserman* was a C.A.R. 21.1 proceeding where we agreed to answer two specific certified questions from the United States District Court. *See Heiserman*, 898 P.2d at 1052. Our resolution of the first certified question,[4] the relevant question for our purposes, only required us to determine whether the language "tortious act," as used in subsection four, encompassed negligence, gross negligence, negligence *per se*, breach of the fiduciary duty of due care, and breach of the fiduciary duty of loyalty. *See id.* We answered this question in the affirmative and concluded that "*the term 'tortious act' appearing in section 13–21–111.5(4)* includes any conduct other than breach of contract that constitutes a civil wrong and causes injury or damages." *Id.* at 1055, 1056 (emphasis added). In our discussion of this question, we repeatedly noted that our holding was limited to the language used in subsection four. *See id.* at 1055–56 ("Such conduct would constitute a 'tortious act' *for purposes of section 13–21–111.5(4).*"), ("We reject the argument that *for purposes of section 13–21–111.5(4)* a distinction should

be made with respect to the degree of fault or the *mens rea* associated with particular conduct."), ("There is no basis to assume that by using the term 'tortious act' *in section 13–21–111.5(4)* the General Assembly for some reason intended to exclude one or more forms of wrongful conduct ....") (emphasis added). We ultimately concluded that "both negligent and intentional acts are sufficient to give rise to *joint liability for purposes of section 13–21–111.5(4).*" *Id.* at 1056 (emphasis added). Our interpretation of the language "tortious act" in section 13–21–111.5(4) does not affect the resolution of the question before us today; therefore, I find the majority's reliance on *Heiserman* unpersuasive.

### C. Other Jurisdictions' Treatment

Other jurisdictions that have addressed this issue have also concluded that a negligent tortfeasor should not be permitted to reduce his liability by comparing his negligence to the actions of an intentional tortfeasor. As I find the reasoning and rationale underlying these cases persuasive on the issue before us, I proceed to review them here.

In a negligence suit brought by a customer of a convenience store against the store owner for personal injuries he sustained when he was robbed by an unknown assailant while leaving the store, the Washington Supreme Court interpreted the term "fault," as defined in their state's liability statutes, as not including intentional conduct. *See Welch v. Southland Corp.*, 134 Wash.2d 629, 952 P.2d 162, 163–165 (1998). The court first noted that the applicable statute "makes clear that ... several liability is now intended to be the general rule and that the statute now evidences legislative intent that fault be apportioned and that generally an entity be required to pay that entity's proportionate share of damages only." *Id.* at 164 (internal quotation marks omitted). The court then noted that the statute defines "fault" as:

> acts or omissions, including misuse of a product, that are in any measure negligent

---

4. The question certified to the court read as follows:

Whether joint and several liability may be imposed on two or more persons,

    pursuant to C.R.S. § 13–21–111.5(4), where the alleged "tortious act" is based on negli-

gence, gross negligence, negligence *per se*, breach of the fiduciary duty of due care, or breach of fiduciary duty of loyalty.

*Heiserman*, 898 P.2d at 1052.

or reckless toward the person or property of the actor or others, or that subject a person to strict tort liability or liability on a product liability claim.... Legal requirements of causal relation apply both to fault as the basis for liability and to contributory fault.

*Id.* (quoting Wash. Rev.Code § 4.22.015) (internal quotation marks omitted). From this broad definition of fault, and despite its recognition that the legislature intended that liability should be apportioned only to the extent of each defendant's fault, the *Welch* court held that the intentional conduct of a tortfeasor could not reduce the liability of a negligent tortfeasor. *See id.* at 165.

In several other states that have addressed this issue, courts have concluded that significant legal principles and policy concerns exist for concluding that the negligence of tortfeasors should not be compared to the actions of intentional tortfeasors for the purposes of apportioning liability, particularly in cases with facts similar to the one before us.

The Tennessee Supreme Court addressed this issue in *Turner v. Jordan* and held that the conduct of a negligent defendant could not be compared with the intentional conduct of another in determining comparative fault where the intentional conduct is the foreseeable risk created by the negligent tortfeasor. *See* 957 S.W.2d 815, 823 (Tenn.1997).[5] In *Turner,* a hospital nurse brought a medical malpractice action against a patient's treating psychiatrist after she was assaulted by the mentally ill patient.

*See id.* at 816–17. The nurse offered evidence at trial in the form of expert testimony that the defendant psychiatrist's failure to medicate, restrain, seclude, or transfer the patient fell below the standard of care and that, as a result of this negligence, she was assaulted by the patient. *See id.* at 817. The trial court instructed the jury that it could allocate the liability for the nurse's injuries between the negligent doctor and the patient's intentional conduct. *See id.* The jury returned a verdict for the nurse and allocated 100% of the liability for her injuries to the negligent psychiatrist. *See id.*

On appeal, the Tennessee Supreme Court determined first that the psychiatrist owed a duty of care to the nurse and breached this duty because the psychiatrist was aware of the patient's violent tendencies, including a previous assault on another hospital staff member, and took no reasonable steps to avoid this type of assault from occurring again. *See id.* at 820. The court then held that it was error for the trial court to allow the jury to apportion liability between the psychiatrist and the mental patient, but concluded that this error was harmless in this case because the jury allocated 100% of the liability to the psychiatrist. *See id.* at 823. In reaching its holding, the court first noted that "comparison presents practical difficulties in allocating fault between negligent and intentional acts, because negligent and intentional torts are different in degree, in kind, and in society's view of the relative culpability of such act." *Id.* The court then observed that this type of comparison "reduces the negligent person's incentive to comply with the applicable duty of care." *Id.* Finally, the court addressed the policy rationale for the holding and noted that the principle of " 'holding the tortfeasor liable for only his own percentage of fault is *not* abrogated by nonapportionment when the nature of the tortfeasor's breach is that *he created the risk of the second tortfeasor's [intentional] act.*' " *Id.* (brackets in original) (emphasis added) (quoting June F. Entman, *The Nonparty Tortfeasor,* 23 Mem. St. U.L.Rev. 105, 107 (1992)).

I find the Tennessee Supreme Court's rationale underlying its holding particularly persuasive on this issue with respect to the facts of the case before us. As the *Turner* court noted, a tortfeasor should not be allowed to reduce his liability by shifting some or all of the blame to an intentional tortfeasor whose actions constitute the precise risk for which the negligent tortfeasor has been found liable for not preventing. In *Turner,* the psychiatrist breached the duty by not taking steps to prevent the assault. In the instant case, Farmers not only did not take steps to remove Dr. Lachow from its list of

---

5. The *Turner* court noted that Tennessee's comparative liability law has developed in case law and is not governed by statute. *See Turner,* 957 S.W.2d at 821.

approved independent medical examiners after learning of the earlier sexual assault, but they instructed Mrs. Slack that she must be examined by Dr. Lachow before they would process her claim. As such, the rationale expressed by the *Turner* court applies with even greater force to the facts of the instant case.

The Kansas Supreme Court has also considered this issue in a trilogy of cases presenting a number of different factual circumstances. In each case, the court held that the liability of a negligent tortfeasor cannot be reduced by comparison to the acts of an intentional tortfeasor. In *M. Bruenger & Co., Inc. v. Dodge City Truck Stop*, 234 Kan. 682, 675 P.2d 864 (1984) the court ruled that the negligence of a truck stop in leaving the plaintiff's tractor-trailer rig unlocked with the keys in the ignition after completing repairs to it could not be reduced by the conduct of a thief who subsequently stole the rig and left it demolished forty miles away. 234 Kan. 682, 675 P.2d 864, 868–69 (1984). The *M. Bruenger* court noted that although Kansas' comparative liability statute speaks only of "negligence," Kansas courts had interpreted that term to mean fault so as to include strict liability cases within its scope. *See id.* at 869. However, the court noted that it had never interpreted the broader concept of fault in the statute to encompass intentional torts and it declined to do so again. *See id.* In reaching its holding, the court reasoned that "[w]hether the thief was a careful driver and kept the vehicle forever, or whether the thief was a careless driver who wrecked the vehicle, does not affect the cause of loss—the failure to exercise reasonable care to prevent theft." *Id.*

In *Gould v. Taco Bell*, 239 Kan. 564, 722 P.2d 511 (1986) the Kansas court was confronted with the issue again when a customer sued Taco Bell for negligence in failing to exercise reasonable care for her safety when she was assaulted by another customer inside the restaurant. 239 Kan. 564, 722 P.2d 511, 513–14 (1986). The *Gould* court rejected Taco Bell's argument that the holding in *M.*

*Bruenger* was limited to bailments and was not applicable to premises liability by reasoning that "we are not comparing apples and oranges. We look to the nature of the duty owed in each instance. A bailee owes a duty of reasonable and ordinary care to prevent the theft of bailed property. The premises owner owes a duty to use reasonable and ordinary care for the safety of invitees. The duty is the same in both cases." *Id.* at 517.[6] The court again declined to allow a negligent tortfeasor to reduce his liability by comparison to the conduct of an intentional tortfeasor.

The Kansas court most recently addressed this issue in *Kansas State Bank & Trust Co. v. Specialized Transportation Services*, 249 Kan. 348, 819 P.2d 587 (1991). The parents of a mentally retarded six-year-old girl brought an action against a school bus driver for sexual assault (battery), and against the school bus transportation service and the school district for negligence in failing to take reasonable steps to prevent the assault. *See id.* at 591. In rejecting the transportation service and school district's argument that their liability should be compared to the bus driver's, the court noted that the asserted negligence was the failure to prevent the bus driver from committing the assault and, thus, their liability should not be reduced by his actions. *See id.* at 606.

The Louisiana courts addressed this issue and adopted a compromise approach to the problem. In *Veazey v. Elmwood Plantation Associates*, 650 So.2d 712 (La.1963) the court held that although Louisiana law does not prohibit the comparison of liability between a negligent tortfeasor and an intentional tortfeasor, courts must decide on a case-by-case basis whether to allow this comparison. 650 So.2d 712, 720 (La.1994). In particular, the court stated that courts should not allow negligent tortfeasors to reduce their fault by the intentional fault of another that they had a duty to prevent. *See id.* at 719. The court noted that application of comparative fault principles in these circumstances "would op-

---

**6.** Our court of appeals in *Miller v. Bryne*, 916 P.2d 566 (Colo.1995) held that a party must owe a duty to the plaintiff in order to be designated as a nonparty whose fault may be considered under section 13–21–111.5. *See* 916 P.2d 566, 578 (Colo.App.1995), *cert. denied*, No. 95SC681 (Colo. May 20, 1996).

erate to reduce the incentive of the [negligent tortfeasor] to protect against the same type of situation occurring again in the future." *Id.* The court further noted that "intentional wrongdoing 'differs from negligence not only in degree but in kind, and in the social condemnation attached to it.' " *Id.* (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 65, at 462 (5th ed.1984)). Applying these principles, the *Veazey* court held that the negligence of an apartment complex owner could not be compared to the intentional conduct of a rapist in a lawsuit by a tenant against the apartment owner. *See id.* at 720.[7]

As these cases demonstrate, there are significant and important legal principles and policy reasons for precluding a negligent tortfeasor from reducing his liability by comparison to an intentional tortfeasor.[8] The rationale underlying these cases is particularly compelling in factual situations like the instant case, where the negligence of the tortfeasor created the exact risk of harm that occurred.

### D. Purpose of Section 13–21–111.5

The majority finally relies on the General Assembly's objectives in enacting the statute as support for its conclusion. *See* maj. op. at 286. In my view, taking into account the rationale of other jurisdictions that have addressed this issue, construing the statute to preclude a negligent tortfeasor from reducing his liability by comparing his negligence to the conduct of an intentional tortfeasor is consistent with the objectives underlying the statute.

As expressed in the majority opinion, the General Assembly abolished joint and several liability in Colorado " 'to reduce *unfair* burdens placed on defendants.' " *Id.* (emphasis added) (quoting *General Elec. Co. v. Niemet,* 866 P.2d 1361, 1364 (Colo.1994)). Under my interpretation of the statute, negligent defendants are still allowed to reduce their liability in proportion to the negligence of other tortfeasors responsible for the same injury. This construction of the statute accomplishes the General Assembly's goal of a reduction in the "unfair burdens" placed on defendants by the common law joint and several liability scheme.

In my view, precluding a negligent tortfeasor from reducing his liability by pointing to the actions of an intentional tortfeasor in no way undermines the General Assembly's goal of reducing the unfair burdens placed on defendants. This case is an ideal example of a "burden" that should not be considered "unfair," and a result that was likely not contemplated by the General Assembly when

---

7. The Louisiana Court of Appeal applied the *Veazey* holding to different factual circumstances in *Muse v. Dunbar,* 716 So.2d 110 (La.Ct.App. 1998). In *Muse* the parents of a seventeen-year-old shooting victim filed suit against the person who shot their son, as well as the two persons who were with their son when he was killed. *See id.* at 113. The jury returned a verdict finding the killer sixty percent at fault, and each of the other two defendants twenty percent at fault. *See id.* The court upheld the jury's verdict, noting that the concerns expressed by the *Veazey* court were not present in this case. *See id.* at 115–16. Notably, the court pointed out that *Veazey* involved a negligent corporate defendant and an intentional individual defendant and that concerns about apportioning fault in corporate or institutional contexts are appropriate because those entities are policy-making bodies capable of affecting the actions of numerous individuals. *See id.* at 115.

After the *Muse* decision, a federal district court in Louisiana confronted this issue and held that the negligence of a hotel in failing to provide adequate security for its guests could not be compared to the actions of an intentional tortfeasor who assaulted one of the guests. *See McAvey v. Lee,* 58 F.Supp.2d 724, 729 (E.D.La.1998). The court noted that if the intentional tortfeasor's conduct "is within the ambit of protection encompassed by the duty owed by the negligent tortfeasor, it is inappropriate to instruct the jury to quantify the fault of the intentional tortfeasor." *Id.*

8. Even the New Jersey Supreme Court, one of the first courts to allow this type of comparison, stated that even though it concluded that New Jersey law allowed this comparison, it also recognized that the reasoning underlying earlier cases "could appropriately be applied to *preclude* apportionment of fault between two tortfeasors when the duty of one encompassed the obligation to prevent the specific misconduct of the other." *Blazovic v. Andrich,* 124 N.J. 90, 590 A.2d 222, 233 (1991) (emphasis added). The *Blazovic* court allowed the comparison to be made in that case only because it believed that the actions of the intentional tortfeasors "neither were sufficiently foreseeable nor bore an adequate causal relationship to [the negligent defendant's]." *Id.*

it passed the statute. Under my construction of the statute, Farmers would not be allowed to reduce its liability by pointing to Dr. Lachow's conduct. Farmers' negligence in referring Mrs. Slack to Dr. Lachow, when it knew he had just recently sexually assaulted another insured, created the exact risk of harm that occurred. Precluding Farmers from reducing its liability in this manner does not impose any unfair burden on Farmers in contravention of the General Assembly's purpose. Accordingly, I believe that this interpretation of the statute is consistent with the General Assembly's purpose in enacting section 13–21–111.5.

## II. CONCLUSION

In conclusion, I believe that the General Assembly's use of the term "fault" in section 13–21–111.5 was not intended to allow for apportionment of liability between a negligent tortfeasor and an intentional tortfeasor. I reach my conclusion based on an analysis of the legislative history concerning the addition of the term "fault" to the statute, as well as a review of the underlying legal principles and policy concerns in this area of law. In my view, before we read section 13–21–111.5, an ambiguous statute that does not compel the majority's conclusion, to allow a negligent tortfeasor to reduce his liability by comparing his actions to those of an intentional tortfeasor, we should require a clear statement of intent on the part of the General Assembly. The interpretation proposed by the majority raises important policy concerns and leads to troubling results best addressed by the legislature. *See* Gregory C. Sisk, *Interpretation of the Statutory Modification of Joint and Several Liability,* 16 U. Puget Sound L.Rev. 1, 26 (1992) ("[T]he expansion of the comparative responsibility concept to intentional wrongdoing raises significant policy concerns that are best resolved in the democratic branch of state government. Beyond the threshold issue of whether comparative fault should include intentional torts at all, there are questions of what situations are best suited for such an application....."). Accordingly, I respectfully dissent.

I am authorized to state that Chief Justice MULLARKEY and Justice BENDER join in this dissent.